**In re NAZI ERA CASES AGAINST GERMAN DEFENDANTS LITIGATION**

**This Matter Relates to all Cases[1] in Which Plaintiffs Have Sought Voluntary Dismissal With Prejudice[2]**

MDL No. 1337.
No. 98–4104 (WGB).

United States District Court,
D. New Jersey.

Dec. 5, 2000.

---

1. This opinion applies to all cases listed in Appendix A.

2. Not all Plaintiffs have sought voluntary dismissal of their actions. This opinion is in no way meant to address the merits of those actions in which Plaintiffs oppose dismissal of their claims.

Allyn Z. Lite, Lite Depalma Greenbert & Rivas, LLC, Newark, NY, Barry A. Fisher, Fleishman & Fisher, Los Angeles, CA, for Plaintiffs.[3]

John J. Gibbons, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, A Professional Corporation, Newark, NJ, for Defendants.

## OPINION

BASSLER, District Judge.

The German National Socialist ("Nazi") era of the 1930's and 1940's will forever be remembered for its virtually unparalleled systematic brutality and inhumanity. Complicit in this bureaucratic barbarism, committed at the time by a modern industrialized state, were numerous German companies and businesses who employed slave and forced labor, appropriated private property, and committed other wrongs against individuals. Plaintiffs are former slave and forced laborers, as well as others who suffered at the hands of German companies during the Nazi era, who have now brought claims against those companies. Their cases were consolidated before the Court as the result of a "motion for centralization," pursuant to 28 U.S.C. § 1407, brought before the Judicial Panel on Multidistrict Litigation ("MDL Panel"). MDL Transfer Order, Docket No. 1337 (August 4, 2000). In the overwhelming majority of these consolidated cases, Plaintiffs have sought voluntary dismissal with prejudice.

In its transfer order, the MDL Panel indicated that common to the some 53 actions before the Court are claims against German companies, including banks, insurance companies, and industrial corporations, (collectively "German Industry"), arising from conduct occurring during the Nazi era. These cases were transferred in light of "an important international agreement which promises to present significant common pretrial issues pertaining to the settlement or dismissal of the actions." MDL Order at 2.

The "important international agreement" referenced in the Transfer Order is that embodied in the German Foundation "Remembrance, Responsibility and the Future" ("The Foundation"). The Foundation is the result of a collaboration among American plaintiffs' attorneys, representatives of German Industry, numerous foreign governments including the United States, Germany, and Israel, and other non-governmental organizations. The Foundation was designed to provide some compensation to the many surviving victims of the Nazi era whose claims rest on the conduct of German Industry during that period. In exchange for receiving this compensation, victims agree to provide German Industry with legal peace.

As agreed to during negotiations, the Foundation provides that before any victims receive their compensation, the legal peace promised to German Industry must be secured, in the form of dismissal with prejudice of all law suits pending in the courts of the United States brought by victims against German Industry. In light of the Foundation's requirements, of the 53 cases that were pending before the Court, Plaintiffs in 49 actions either noticed or moved for voluntary dismissal of their claims, with prejudice. Additionally, Defendant companies in the remaining cases have also moved to dismiss with prejudice, on a wide array of legal grounds. Of the 49 cases where Plaintiffs moved to voluntarily dismiss, 42 were brought as putative class actions under Rule 23 of the Federal Rules of Civil Procedure.

While individual actions may be dismissed on stipulation of the parties, cases brought as putative class actions may only be dismissed upon approval of the Court. The procedure for this approval, and a determination of whether notice to the putative class is required under Rule 23(e), are the focus of this opinion.

After thorough consideration of the voluminous briefs and affidavits filed with the court, including a letter from the German

**3.** A full list of appearances is listed in Appendix B. The Court wishes to express its appreciation to Allyn Lite, Prof. Burt Neuborne, John Gibbons, Roger Witten, and Thomas Valen for their tireless efforts and assistance to the Court.

Ambassador and a Statement of Interest of the United States Government, and after conducting a lengthy public hearing on November 13, 2000, the Court ruled that these 42 putative class actions may be voluntarily **dismissed with prejudice,** and that **notice to members of the putative class pursuant to FRCP 23(e) is not required.** The Court also ruled that these dismissals are **expressly subject to F.R.C.P. 60(b).** With appropriate orders already entered following the Court's ruling from the bench, this opinion expresses in more detail the rationale for the Court's decision.

## I.  BACKGROUND

The atrocities of the Nazi era and World War II are well documented, as are the more than five decades of international treaties and agreements that have sought to partially atone for them. *See Burger–Fischer v. De-Gussa AG,* 65 F.Supp.2d 248 (D.N.J.1999); *Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424 (D.N.J.1999) (detailing the post-war arrangements for reparations prior to the creation of the Foundation).[4] Plaintiffs have all sought recovery against German Industry for its alleged role in these atrocities, on the grounds that their injuries were not redressed by prior arrangements for reparations.[5]

The great majority of Plaintiffs before the Court sought the voluntary dismissal of their claims with prejudice so that they could recover from the new German Foundation. As the Court's approval of these dismissals

hinged on both the nature of the negotiations leading to formation of the Foundation and on the impact of the Foundation on putative class members, this opinion initially sets forth some of the history and scope of this ground-breaking agreement.

### A.  *History of the Negotiations*

The negotiations which culminated with the creation of the Foundation began in the Fall of 1998, when the German Government asked Stuart E. Eizenstat to help facilitate a resolution of the numerous class action law suits pending in the United States against German companies who utilized slave and forced labor, and committed other wrongs, during the Nazi era. Decl. of Stuart E. Eizenstat ¶ 5 (attached as Exh. 1 to the Statement of Interest of the United States ("Statement of Interest")). Eizenstat is currently Deputy Secretary of the Treasury and Special Representative of the President and the Secretary of State on Holocaust Issues, but at the time acted as Under Secretary of State for Economic Affairs. *Id.* at ¶ 1.

Over a year and a half, Eizenstat co-chaired a series of formal and informal discussions among lawyers for both Plaintiffs and Defendants and the German Government on a "proposed initiative to establish a foundation to make payments to victims of slave and forced labor and all others who suffered at the hands of German companies during the Nazi era." *Id.* at ¶ 5. Also participating in these discussions were the State of Israel,

4.  "The German Government's restitution and compensation programs addressing Nazi era and World War II wrongs...have been identified by the United Nations as '[t]he most comprehensive and systematic precedent of reparation by a Government to groups of victims for the redress of wrongs suffered....' " Memo. in Supp. of Mot. of all Defendants to Dismiss all Remaining Claims in all Actions with Prejudice as to the Named Defendants, at 21 (*quoting Study Concerning the Right to Restitution, Compensation and Rehabilitation for Victims of Gross Violations of Human Rights and Fundamental Freedom,* U.N. Sub–Commission on Prevention of Discrimination and Protection of Minorities, 45th Sess. Provisional Agenda Item 4 at 55, ¶ 107, U.N.Doc. E/CN. 4/Sub. 2/1993/8 (Certification of John J. Gibbons in Support of Motion of All Defendants to Dismiss All Remaining Claims in All Actions With Prejudice as to the Named Plaintiffs, Vol.

XV Exh. 41 at 65)); *See also,* Michael J. Bazyler, *Nuremberg in America: Litigating the Holocaust in United States Courts,* 34 U. Rich. L.Rev. 1 (2000).

5.  *See* Allyn Z. Lite, *Another Attempt to Heal the Wounds of the Holocaust,* 27 Human Rts. 12 (2000); Stuart M. Kreindler, Comment, *History's Accounting: Liability Issues Surrounding German Companies For the Use of Slave Labor by Their Corporate Forefathers,* 18 Dick. J. Int'l. L. 343 (2000); Darcie L. Christopher, Note, *Jus Cogens, Reparation Agreements, and Holocaust Slave Labor Litigation,* 31 Law & Policy in Int'l. Bus. 1227 (2000); Justin H. Roy, Comment, *Strengthening Human Rights Protection: Why the Holocaust Slave Labor Claims Should Be Litigated,* 1 Scholar: St. Mary's L.Rev. Minority Issues 153, 177 (1999).

the governments of Belarus, the Czech Republic, Poland, Russia, and Ukraine, and the Conference on Jewish Material Claims Against Germany, which is an umbrella organization representing numerous international Jewish non-governmental organizations. *Id.* at ¶ 6. Through these numerous participants—which included interested parties on both sides of the litigation before the Court, as well as legally disinterested third parties—the interests of victims were "broadly and vigorously" represented, as were the interests of Defendant corporations. *Id.*

According to Plaintiffs' attorneys who participated in the bulk of the meetings and conferences, the negotiations were intensive, lengthy, hard-fought, and conducted at arms length. Decl. of Stephen A. Whinston in Supp. of Anolik Plaintiffs' Mot. for Approval of Voluntary Dismissal with Prejudice ¶¶ 1–2; Decl. of Morris A. Ratner in Supp. of Mot. for Voluntary Dismissal at ¶ 14. The negotiations began with the parties far apart on virtually every issue, "ranging from the total amount of money, to its allocation among various types of claims, to the extent of coverage." Whinston Decl. ¶ 2.

The quasi-formal initiative which had been on-going since February, 1998, was publicly announced by German Chancellor Gerhard Schroeder, as well as a group of German companies, on February 16, 1999. Eizenstat Decl. ¶ 7. After the public announcement, twelve formal conferences chaired by representatives of the United States and German Governments were held to discuss the initiative. *Id.* As a result of these conferences, and following the personal involvement of U.S. President Clinton and German Chancellor Schroeder,[6] in December, 1999, it was agreed that a foundation would be established, in exchange for which plaintiffs would dismiss their claims against German defendants. *Id.* at ¶ 8.

After "extremely difficult" negotiations, the precise terms of funding for the foundation and of how those funds would be allocated were reached. *Id.* at ¶ 10. These negotiations were only successful after compromises were made by "all parties," Whinston Decl. ¶ 2, and were the result of "vigorous arms length bargaining" between all present. Decl. of Burt Neuborne in Supp. of Plaintiffs' Mot. Pursuant to Rule 23(e) to Dismiss the Claims of Putative Class Members Without Prejudice ("2nd Neuborne Decl.") ¶ 7.

In July, 2000, almost two and a half years after negotiations began, the German Parliament passed a law creating the Foundation "Remembrance, Responsibility and the Future," which closely embodied the detailed agreements reached by the parties to the negotiations. Eizenstat Decl. ¶ 11. The parties gathered in Berlin on July 17, 2000, to sign a Joint Statement concluding the negotiations, and expressing their support for the Foundation. *Id.* at ¶ 12. The Governments of the United States of America and the Federal Republic of Germany simultaneously signed an Executive Agreement, which memorialized the specific commitments of the two Governments to the Foundation. *Id.*

### B. *The Foundation Agreement*

The law which actually created the Foundation as a legal entity [7] was promulgated in Germany on August 12, 2000. Eizenstat Decl. ¶ 13. On October 19, 2000, in accordance with the Executive Agreement, the United States and German Governments exchanged diplomatic notes,[8] stipulating that the agreement officially entered into force on the date of the exchange. *Id.*

As established under the Foundation Law, the Foundation will make payments to Nazi era victims. *Id.* at ¶ 15; Foundation Law § 1(1). These payments will come out of a total fund with an initial capitalization of DM

---

**6.** *See* Letter from President William Clinton to German Chancellor Gerhard Schroeder (Undated) ("Clinton Letter"), Attached as Exh. 3 to the Statement of Interest.

**7.** *Gesetz Zur Errichtung Einer Stiftung "Erinnerung; Verantwortung und Zukunft."* Translated as "Law on the Creation of a Foundation 'Re-

membrance, Responsibility and Future'" (*cited as* "Foundation Law"). All subsequent references to the Foundation Law in this opinion are to the English language translation, Attached as Exh. 2 to the Statement of Interest.

**8.** Attached as Exh. C to the Statement of Interest.

10 Billion. *Id.* at ¶ 16; Foundation Law § 3(2). This money shall be contributed in equal shares by the German Government and German Industry. *Id.*

Those who suffered at the hands of German Industry during the Nazi era, including those who worked as slave or forced laborers for the Nazi regime, were subjected to medical experimentation, were held in a "kinderheim" (children's home), had property "aryanized", stolen, or damaged, or whose insurance policies went unpaid will be eligible to recover. Eizenstat Decl. ¶¶ 15–17. Eligible claimants are either those who personally were victims, or the heirs of victims who died after February 16, 1999. *See* Foundation Law § 13. It is estimated that the Foundation will cover approximately one million victims across the United States, Eastern and Central Europe, and the rest of the World. Statement of Secretary of State Madeline K. Albright, on the Establishment of the German Foundation "Remembrance Responsibility and the Future." (October 20, 2000) (Attached as Exh. 4 to the Statement of Interest).

Each type of victim is entitled to a different rate of recovery under the Foundation Law. Each former slave laborer[9] will recover up to DM 15,000, and each former forced laborer[10] will recover up to DM 5,000. Eizenstat Decl. ¶ 16. Total payments to these two groups will exceed DM 8 Billion. *Id.*; *See* Foundation Law § 9. Those who suffered other non-labor related personal injuries, such as injuries from medical experimentation, are eligible to apply for pro-rata payments from a separate DM 50 million pool. Eizenstat Decl. ¶ 16. All property claimants are eligible to recover a pro-rata share of a DM 200 million fund set aside for that purpose, with a similar DM 550 million fund set aside for insurance claims and a DM 300 million humanitarian fund set aside for those unable to document specific claims. *Id.*

All victims, not merely those currently named as plaintiffs in legal actions, may apply for recovery from the Foundation.[11] Eizenstat Decl. ¶ 20. This was an important goal during negotiations, as "throughout the negotiations, attorneys representing the victims vigorously represented not only the named plaintiffs in their cases, but also the interests of heirs and others who are similarly situated." *Id.* As the Foundation Law is designed to actually benefit victims, a provision has been included seeking to protect claimants from any reduction in pension payments that might otherwise result from the receipt of a lump sum of money. Foundation Law, § 15(1).

Payments to individuals will not be made directly by the Foundation; rather seven distinct partner organizations[12] will handle the actual collection and processing of applications, and the distribution of payments. Eizenstat Decl. ¶ 23; *See generally* Foundation Law, § 10. Each organization is allocated specific funds, based on the estimated number of applicants they will have. *Id.* The application process itself will be short, simple, non-bureaucratic, non-adversarial, and will not require legal representation. Eizenstat Decl. ¶ 25. Determinations of eligibility are to be made on relaxed standards of proof, and a free appeals process will be available. *Id.*; Foundation Law § 19.

Given the advanced age of the victims, the primary humanitarian objective of the Foundation is to show results as soon as possible. Joint Statement, ¶ 2. For this reason, the

---

**9.** Slave laborers are those who were intended to be literally worked to death. Eizenstat Decl. ¶ 16.

**10.** Forced laborers are those who were compelled to work against their will, but in somewhat less harsh conditions than slave laborers. Eizenstat Decl. ¶ 16.

**11.** Any previous compensation an individual has received from other sources for Nazi injustices will be counted against any potential payments a victim might be entitled to recover under the Foundation Law. Foundation Law, § 15(2).

**12.** Five are geographically based, specifically covering 1) Poland; 2) Ukraine and Moldova; 3) the Russian Federation, Latvia, and Lithuania; 4) Belarus and Estonia; and 5) the Czech Republic. The Conference on Jewish Material Claims Against Germany is responsible for payments to Jews located worldwide, outside the five geographic organizations. The International Organization for Migration is responsible for all other payments worldwide, outside the five geographic organizations. Eizenstat Decl. ¶ 23; Foundation Law § 9(2).

Foundation has mechanisms allowing for expedited payments. Eizenstat Decl. ¶ 19. It is the goal of the Foundation to begin payments to slave and forced labor victims as soon as all those cases pending in the United States that are listed in Annexes C and D to the Joint Statement have been dismissed with prejudice. *See* Statement of Interest, Exh. A. Property claims are expected to be paid within one year from the close of the application period. Eizenstat Decl. ¶ 27. The processing of insurance claims has already begun. *Id.*

In addition to the payments to victims, Foundation Law § 2(2) designates DM 700 million for a Future Fund, which is designed to promote tolerance and Holocaust awareness, and to support projects that benefit the heirs of those forced and slave laborers who did not survive. Eizenstat Decl. ¶ 19.

Out of the total fund of DM 10 Billion, only DM 200 Million has been allocated to administrative and legal fees. Eizenstat Decl. ¶ 19. By side agreement, modest payments (no more than 15,000 DM) will also be made out of attorneys fees to each named plaintiff in the United States that voluntarily dismisses their claims with prejudice. Whinston Decl. ¶¶ 3(c), 6; Ratner Decl. ¶ 15. These payments were insisted on because only the named plaintiffs are being asked to dismiss their cases with prejudice prior to the receipt of compensation, Whinston Decl. ¶ 6, and because the negotiations which eventually ended up benefitting the entire class were only commenced by virtue of the named plaintiffs "coming forward to bring this issue into focus and thereby exposing a painful chapter in their lives in a very public way." *Id.;* Decl. of Stephen G. Rinehart ·in Supp. of *Blau* Plaintiffs' Mot. for Approval of Voluntary Dismissal with Prejudice ¶ 3(e).

The total fee award to all attorneys has been cumulatively capped at DM 125 million, or 1.25% of the total capitalization of the Foundation. Eizenstat Decl. ¶ 19. The negotiations for attorneys fees and stipends for named plaintiffs were not initiated until all the other material terms of the agreement had been reached. Whinston Decl. ¶ 4; Ratner Decl. ¶ 14. They were neither agreed to nor understood to be forthcoming during the negotiation of the material terms of the agreement. Whinston Decl. ¶ 4.

Attorneys must seek fees from the Foundation through an arbitration process. Eizenstat Decl. ¶ 19. This arbitration process will be binding, and will award proportional fees to the various attorneys that represent different plaintiffs. Whinston Decl. ¶ 5. The arbitration will be conducted by two arbitrators; Nicholas Katzenbach, appointed by the German Government, and Kenneth Feinberg, appointed by the United States Government. *Id.*

The Foundation will be run by a Board of Trustees, composed of 27 members equally representing the interests on both sides. Eizenstat Decl. ¶ 21; Foundation Law §§ 4(1), 5. It is presently chaired by the German Ambassador to the United Nations, and is managed by a three person Board of Directors. Eizenstat Decl. ¶ 18; Foundation Law §§ 5(1)(1), 4(2), 6. The Board of Directors and the Board of Trustees will together make decisions on those matters not covered by the enabling Foundation legislation. *Id.; See* Foundation Law §§ 5–6. The Foundation is to be run in a transparent and public manner, and is subject to both legal oversight and auditing by the German Government. Eizenstat Decl. ¶ 22; Foundation Law § 8.

## C. *The Role of the United States*

### 1. *The Executive Agreement*

Unlike typical international agreements, the Agreement between the Governments of the Federal Republic of Germany and the United States of America concerning the Foundation "Remembrance, Responsibility and the Future" is not a government-to-government claims settlement agreement. Eizenstat Decl. ¶ 14. Rather than extinguishing the legal claims of its nationals or anyone else, the United States merely helped facilitate an agreement between victims, German Industry, and the German Government. *Id.* By acting in this manner, the United States' goal was to "bring expeditious justice to the widest possible population of survivors, and to help facilitate legal peace." *Id.*

In keeping with this, the United States agreed to, via the filing of a Statement of Interest in all pending cases, "advise U.S. courts of its foreign policy interests...in the Foundation being treated as the exclusive remedy for World War II and Nazi era claims against German companies, and, concomitantly, in current and future litigation being dismissed." *Id.; See* Executive Agreement, Art. 2 & Annex B.

2. *The Statement of Interest of the United States*

In accordance with the Executive Agreement, the United States has filed with this Court a Statement of Interest with attachments, designed to articulate both the Government's "foreign policy interests with regard to the German Foundation 'Remembrance, Responsibility and the Future' ..., and the public interest in the cooperative resolution of claims for restitution and compensation arising out of the Holocaust." Statement of Interest, at 1–2. While the Statement of Interest is non-binding on the Court, the Government "recommends dismissal on any valid legal ground." *Id.* at p. 2.[13] Specifically, the United States Government believes that:

[A]ll claims against German companies arising from their involvement in the Nazi era, including but not limited to claims relating to slave and/or forced labor, aryanization, medical experimentation, placement in children's homes, other cases of personal injury, and damage to or loss of property, including banking assets and insurance policies, should be pursued through the Foundation instead of the courts.

Eizenstat Decl. ¶ 28.

The position of the United States Government recommending dismissal is motivated by the twin concerns of justice and urgency: matters of Holocaust-era restitution are best resolved through dialogue, negotiation, and cooperation as opposed to prolonged and uncertain litigation; and this provides some measure of justice and compensation to aged

victims in their lifetimes. *See* Statement of Interest, at 2; Eizenstat Decl. ¶¶ 3, 29.

The Statement of Interest notes that the Foundation exemplifies the successful implementation of policies that the Government favors, because it is the result of the parties, governments, and non-governmental organizations together reaching a plan for restitution and compensation through dialogue, negotiation, and cooperation. Statement of Interest, at 3. As President Clinton indicated, both the United States and German Governments "believe in the historical and moral significance of bringing a sense of justice to former slave and forced laborers and others who suffered at the hands of German banks, insurance companies, and other German companies during the Nazi-era. We can help restore a measure of human dignity to those who suffered and survived." Clinton Letter, at 2.

It is the opinion of the Government that the "creation and successful operation of the Foundation is in the enduring and high interests of the United States," Eizenstat Decl. ¶ 28, for a number of reasons. Of primary importance to the Plaintiffs and to the putative class, it may allow for "some measure of justice to Holocaust survivors and other victims of the Nazi era, who are elderly and are dying at an accelerated rate, in their lifetimes." *Id.* at ¶ 29. The Foundation will, "without question, provide benefits to more victims, and will do so faster and with less uncertainty than would litigation, with its attendant delays and legal hurdles." *Id.* at ¶ 30. It will also benefit all who have been injured by German Industry, not merely those who have been injured by the few surviving elements of German Industry that are within the limited reach of the courts of the United States. *Id.*

For the large number of victims living in the former communist countries of Central and Eastern Europe, the Foundation will provide their first opportunity for relief, as they were until now denied recovery under existing plans for reparation. *Id.* at ¶ 35.

---

**13.** The Statement of Interest does not address the merits of any legal claims before the Court. The Statement of Interest merely argues for dismissal on "any valid legal ground." *See* Statement of Interest, at 21–22.

These mostly non-Jewish surviving laborers were largely overlooked by previous plans. *Id.*

It is the opinion of the United States that the alternative to the Foundation "would be years of litigation whose outcome would be uncertain at best, and which would last beyond the expected life span of the large majority" of victims. Eizenstat Decl. ¶ 36. As dismissal of *all* the pending lawsuits is also requisite to *any* payment being made by the Foundation, the United States supports such dismissal as soon as possible, so that Germany may have legal peace, and the victims may have recovery. *Id.*

Fifty five years after the end of World War II, nearly $100 billion in current dollars has already been paid by way of reparations to the victims of Nazi atrocities. *Id.* The Foundation adds another $4.3 billion, which for the first time includes the significant contributions of the German private sector. *Id.* In sum, it is the position of the Government that:

> All participants in the negotiations accepted the level of the Foundations' funding, eligibility criteria, payment system, and the allocation of its funding among various categories of victims. No amount of money could truly compensate plaintiffs for the wrongs done to them. But the payments they will receive through the Foundation will serve as a recognition of their suffering and will enable them to live with less difficulty than would be the case without the payments. In addition, creation of the Foundation will allow establishment of the Future Fund, which will be dedicated in part to efforts to ensure that crimes like the Holocaust never will happen again, and will also fund projects that serve to benefit the heirs of victims that did not survive.

The United States, together with the participating lawyers for the victims and all other parties to the negotiations, therefore believes that the Foundation is fair under all the circumstances. The creation of the Foundation, the United States hopes, will serve as an example to other nations and in other cases where resolution of claims by victims of the Nazi era for restitution and compensation has not yet been achieved.

Eizenstat Decl. ¶¶ 31–32.

### D. *Implementation of the Foundation*

As previously mentioned, while the Foundation is not properly a "settlement" in the legal sense, German Industry and the German Government have insisted on the dismissal of all pending litigation in the United States, as a pre-condition to allowing the Foundation to make payments to victims. Eizenstat Decl. ¶ 37. The rationale is that, given the substantial contribution (a planned DM 5 Billion) of German Industry, they should not be asked or expected to contribute again for any wrong arising from the Nazi era. Executive Agreement, at 3.

The dismissal of the remaining active law suits in the United States is the only remaining pre-condition that must be fulfilled prior to the payment of reparations to victims in these cases. *See* Letter from Jürgen Chrobog, German Ambassador to the United States, to the Court, dated October 9, 2000 ("Chrobog Letter"), at 3. These dismissals must be with prejudice to the named plaintiffs, but will not prejudice the rights of putative class members. Whinston Decl. ¶ 3(e); Rinehart Decl. ¶ 3(e). Once the last case is dismissed, the Foundation should apparently be ready to make payments, as detailed below.

The Foundation administration is up and running, according to Prof. Burt Neuborne, who is both an attorney for a number of Plaintiffs and who holds the seat allocated to an American lawyer for the plaintiffs on the Foundation Board of Trustees. The first meeting of the Foundation Board of Trustees took place in Berlin on August 31, 2000. Decl. of Burt Neuborne in Supp. of Mot. for Voluntary Dismissal ("1st Neuborne Decl.") ¶¶ 1, 3. The Board of Trustees is chaired by Dr. Dieter Kastrup, Germany's Permanent Representative to the United Nations. 2nd Neuborne Decl. ¶ 10. The Board of Trustees functions as the policy-making and ultimate governance organ of the Foundation. *Id.* at ¶ 11.

The three person Board of Directors, the executive arm of the Foundation, was duly

elected at a second meeting of the Board of Trustees on September 20, 2000. *Id.* at ¶ 3. The Board of Directors is composed of Avi Primor, Vice President of Tel Aviv University and former Israeli Ambassador to Germany; Dr. Hans–Otto Brautigam, a former German Ambassador to the United Nations and former state Minister of Justice; and Dr. Michael Jansen, a former member of the German Foreign Service who during negotiations was a member of the German industrial delegation. *Id.* Dr. Jansen was elected Chair of the Board of Directors, and is now a full-time employee of the Foundation. *Id.*

The Board of Directors has secured the services of Gunther Saarthof, "a past member of the parliamentary delegation of the Green Party with a long and respected record of efforts to provide justice to victims of National Socialism." 2nd Neuborne Decl. ¶ 11. Mr. Saarthof has been vested with operational authority for the distribution of the DM 8.1 Billion allocated to slave and forced laborers. *Id.* Through Mr. Saarthof, the Foundation has been working with the partner organizations to negotiate formal contracts detailing the procedures by which the victims are to be identified and the funds disbursed. *Id.* at ¶ 12. These partner organizations have also begun ambitious publicity programs (detailed in section I(E) of this opinion, *infra*). *Id.* at ¶ 14.

The Governments of the United States and Germany are now bound to their commitments in support of the Foundation, for as previously indicated, the exchange of notes between the United States and German Governments took place at 4:00 PM on October 19, 2000. 1st Neuborne Decl. ¶ 5(B). As a result of this exchange of notes, the Executive Agreement has been in effect since that date. *Id.*

Lastly, the Foundation has become economically viable. 2nd Neuborne Decl. ¶ 15. The German Government has already made its initial payment of DM 2.5 Billion to the Foundation, and is scheduled to make its second payment by the end of 2000. *Id.* German Industry is also publicly committed to making its payment of DM 5 Billion, with appropriate interest, as soon as the cases still pending in America are dismissed. *Id.* Concerns do exist, however, as to whether German Industry will in fact achieve full funding of its DM 5 Billion share. Joint Decl. of Kenneth F. McCallion and Pompeyo Roa Realuyo in Supp. of Mot. for Dismissal ("McCallion/Realuyo Decl.") ¶ 4.

### E. *Victims' Awareness of the Foundation*

The Foundation has begun a process designed to ensure that the maximum number of applicants worldwide are made aware of the opportunity they have to apply for benefits from the Foundation. Eizenstat Decl. ¶ 24. The Extensive global media publicity that has followed the creation of the Foundation has aided in this effort. *See* Ratner Decl. ¶¶ 2–11. A sampling of articles from the United States, Israel, and countries as far afield as South Africa show not just coverage of the Foundation, but coverage of the Foundation's impact on legal proceedings in the United States. *Id.* Specifically, the articles note that payment by the Foundation is contingent on all pending cases in the United States being dismissed, and that the United States will seek to block future filings of class action suits against German Industry. *Id.*

Through its partner organizations, the Foundation has begun publicity programs worldwide. 2nd Neuborne Decl. ¶ 13. The International Organization for Migration has commenced a program to not only provide information to potential claimants, but to aid in filling out the necessary forms. 2nd Neuborne Decl. Exh. B. The partner organization for Poland has also engaged in an outreach program by holding regular information meetings for victims, creating an Internet web site, setting up a toll-free number, and placing ads in dozens of newspapers and periodicals. 2nd Neuborne Decl. Exh. C. The other regional organizations are engaging in similar programs. *Id.* at ¶ 13. The Jewish Material Claims Conference has used "earned media, paid media, direct mail and organizational outreach to provide notice and assistance to persons throughout the world," including advertising in at least 26 countries on five continents, via the targeting of 273 publications with a combined readership of

almost 21 million. 2nd Neuborne Decl. ¶ 13, Exh. D.

In addition to working through its partner organizations, the Foundation, at its third and most recent Board of Trustees meeting on November 2, 2000, allocated a budget of DM 15 million for additional notice and outreach programs, to be implemented directly by the Foundation. 2nd Neuborne Decl. ¶ 13. This was adopted over and above the already substantial existing programs of the partner organizations. *Id.* This program is designed to fill in any gaps that may exist in the coverage of the partner organizations. *Id.*

It is the position of the United States that the negotiators of the agreements leading to the establishment of the Foundation had the requirements of F.R.C.P. 23(e) in mind when they "committed the Foundation to broad public notice of its existence, objectives, and the availability of funds," so as to avoid the prospect that any absent class member might be prejudiced from having relied on the pendency of a class action to protect their rights, should that action subsequently be dismissed without individual notice to them. Statement of Interest, at 22–23. The determination of whether notice of dismissal to the putative class is mandated by Rule 23(e) is the central issues addressed by this opinion.

## II. ANALYSIS

### A. *Voluntary Dismissals Generally*

Federal Rule of Civil Procedure 41(a) governs voluntary dismissals of actions. As previously indicated, this opinion deals only with those cases in which the Plaintiffs have pursued voluntary dismissal. The remaining cases in which dismissal has been opposed by Plaintiffs will be decided at a later date by the Court.

The portion of Rule 41(a) relevant to the Court's analysis states, "[s]ubject to the provisions of Rule 23(e) ... an action may be

dismissed by the Plaintiff without order of court..." Fed.R.Civ.P. 41(a).

The handful of cases before the Court that were commenced as individual actions in which Plaintiffs have sought dismissal [14] could clearly have been dismissed without action of the Court under Rule 41(a)(1), but in the interest of thoroughness the Court has entered orders dismissing those cases with prejudice.

Unlike the individual actions, the remaining cases, those which were brought as putative class actions (the majority of the actions before the Court), could not have been dismissed without court approval. Rule 41(a) explicitly states it is "subject to" the provisions of Rule 23(e),[15] which provides as follows:

> Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the Court directs.

Fed.R.Civ.P. 23(e).

The combination of Rule 41(a) and Rule 23(e) are clearly drafted to take away a class action plaintiff's right under Rule 41(a)(1) to voluntarily dismiss without approval of the court. It is unclear on the face of Rule 23(e) whether it applies to class actions that have yet to be certified, and what the extent of its notice requirements actually are.

In interpreting Rule 23(e), the Third Circuit has held that any "suit brought as a class action should be treated as such for purposes of dismissal or compromise, until there is a full determination that the class action is not proper." *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.1970), *cert. denied sub nom. Glen Alden Corp. v. Kahan,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), *citing Philadelphia Electric Co. v. Anaconda Am. Brass Co.,* 42 F.R.D. 324

---

**14.** See Appendix A of this opinion.

**15.** The statement that rule 41(a)(1) is "subject to the provisions of Rule 23(e)" should not be read to exclude the dismissal of class actions from Rule 41(a)(1). Quite to the contrary, "the 'subject to' clause merely incorporates the proce-

dures of rule 23(e), that is, court approval and appropriate notice, into the stated provisions of rule 41(a)(1)." *Larkin General Hospital, Ltd. v. American Telephone and Telegraph Co.,* 93 F.R.D. 497, 499–500 (E.D.Pa.1982).

(E.D.Pa.1967).[16] Several other circuits agree, *See McArthur v. S. Airways, Inc.*, 556 F.2d 298 (5th Cir.1977); *Glidden v. Chromalloy Am. Corp.*, 808 F.2d 621 (7th Cir.1986); *Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401 (9th Cir.1989), as do scholars. *See* 7B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d*, § 1797 at 346–50 (1986).

Circuit courts, however, are not unanimous in their application of Rule 23(e) to class actions prior to certification, with the Fourth Circuit's widely cited decision in *Shelton v. Pargo, Inc.*, 582 F.2d 1298 (4th Cir.1978), being a notable exception to the rule embraced by the Third, Fifth, Seventh, and Ninth Circuits. Even in *Shelton*, however, the Fourth Circuit found on the basis of fiduciary duty that an uncertified class action should not be settled without the court's approval. *Id.* at 1302–05.

Although class actions have not been certified in any of the cases presently before the Court, it is clear to the Court in light of the foregoing interpretations of Rule 23(e) that the putative class actions before it may not be dismissed without approval. Court approval of a dismissal pursuant to Rule 23(e) prevents the class action device from being used in an abusive manner, *Magana v. Platzer Shipyard, Inc.*, 74 F.R.D. 61, 65 (S.D.Tex.1977), as it allows a court to ensure that the representative plaintiffs have not settled or dismissed their claims to the prejudice of a prospective class prior to certification, and ensures that the class action is not being used by plaintiffs to secure a collusive private settlement. *See, e.g., Glidden*, 808 F.2d at 626–27; *Simer v. Rios*, 661 F.2d 655, 665 (7th Cir.1981); *Shelton*, 582 F.2d at 1314; *Larkin*, 93 F.R.D. at 500.

The fear of these abuses stems partially from the fact that plaintiff's counsel typically serves as the negotiator on behalf of the named plaintiff and the asserted class. *Magana*, 74 F.R.D. at 65. The concern is that "'absent appropriate judicial inquiry...[a] plaintiff's attorney may accept an insufficient judgment for the class in trade for immediate and certain compensation for himself in the form of legal fees deducted from the total available funds proffered by defendant.'" *Id.* quoting *Foster v. Boise–Cascade, Inc.*, 420 F.Supp. 674, 686 (S.D.Tex.1976).

Even if the named plaintiffs and defendants in a case reach a settlement that is seemingly fair and untainted, prospective class members may still be prejudiced, as the termination of the representative action may also terminate the vehicle to recovery upon which those un-named members relied. *See Diaz*, 876 F.2d at 1409–10; *Shelton*, 582 F.2d at 1315.

■ In order to avoid these hazards, a district court should make a "proper inquiry" to determine whether a proposed settlement and dismissal are tainted by collusion or will prejudice absent members of the putative class. *Shelton*, 582 F.2d at 1315; *Diaz*, 876 F.2d at 1408. When engaging in this inquiry, a court need not perform the sort of substantive oversight required when reviewing the settlement of a certified class, nor need it engage in the laborious duty of conducting a certification determination, as the dismissal is not res judicata against the putative class. *Shelton*, 582 F.2d at 1311; *Diaz*, 876 F.2d at 1408.[17]

When contemplating the dual aims of avoiding collusion and prejudice, the focus should primarily be on the possibility that the pre-certification compromise is the prod-

---

**16.** When dealing with cases that have been consolidated for pretrial proceedings pursuant to an order of the MDL Panel under 28 U.S.C. § 1407, the law of the transferor forum merits close attention, but should not be read to have stare decisis effect in a transferee forum situated in another circuit. *See In re Korean Air Lines Disaster*, 829 F.2d 1171, 1176 (D.C.Cir.1987). For this reason the Court will apply the law of the Third Circuit, with due consideration given to the rulings of other circuits.

**17.** Scholars have also supported more modest standards for approval of voluntary dismissals in the pre-certification context than for dismissals after certification of a class action. *See, e.g.,* Arthur R. Miller, *An Overview of Federal Class Actions: Past, Present, and Future*, p. 58 (Federal Judicial Center Monograph 1977); *Notice of Proposed Dismissal or Compromise of Class Action to Absent Putative Class Members in Uncertified Class Action Under Rule 23(e) of Federal Rules of Civil Procedure*, 68 A.L.R. Fed. 290, 1984 WL 263449 (1984).

uct of collusion. *Shelton,* 582 F.2d at 1314 n. 55, *citing Magana,* 74 F.R.D. at 67. The *Magana* court placed greater emphasis on the collusion analysis, as it is in the pre-certification phase that the possibility of "legalized blackmail" of defendants with the threat of potential class-wide liability is at its height, and plaintiffs are most likely to sacrifice their previously-asserted class interests for private gain. *Id.*

When focusing on the possibility of collusion, a court should conduct a careful, factual inquiry into the terms of the settlement, particularly the amount paid the plaintiff in purported compromise of his individual claim and the compensation to be received by plaintiff's counsel. *Shelton,* 582 F.2d at 1315. It has also been held that in an inquiry into collusion, without any evidence to the contrary, a court may accept as sufficient counsels' representations that there has been no collusion or bad faith underlying their motivation in dismissing the class claims. *In re Towers Fin. Corp. Noteholders Litig.,* 1998 WL 64151, *1 (S.D.N.Y.1998), *referring to Chichilnisky v. Tru. of Columbia Univ.,* 1993 WL 452526 (S.D.N.Y.1993).

The rationale for placing "less weight" on the prejudice analysis is that a "pre-certification dismissal does not legally bind absent class members," and, before certification, the absent putative class member has at best a speculative reliance interest. *Shelton,* 582 F.2d at 1314–15, *quoting Magana,* 74 F.R.D. at 69. As a part of the prejudice analysis, this reliance interest, which will vary according to the facts of each case, must be taken into account. *Magana,* 74 F.R.D. at 67.

If, after a careful, factual inquiry a court finds neither collusion nor prejudice to be present, it may approve the dismissal. *Diaz,* 876 F.2d at 1408; *Shelton,* 582 F.2d at 1316. If, on the other hand, a court should find that the settlement was tainted or will prejudice the interests of putative class members, rather than reject the dismissal the court should do no more than require notice and allow an opportunity to intervene. *Id.*

### B. *Rule 23(e) Notice Requirement*

When confronted with the dismissal of a certified class action, Rule 23(e) requires not just court approval, but such notice of the settlement to members of the class as the court directs. Fed.R.Civ.P. 23(e). In the context of a putative class action, court mandated notice of dismissal serves largely the same purposes as court approval of dismissal. *Diaz,* 876 F.2d at 1409.

Requiring notice forces a representative plaintiff to consider their duties to the putative class, which is in keeping with the goal articulated in *Philadelphia Electric,* that "no litigant should be permitted to enhance his own bargaining power by merely alleging that he is acting for a class of litigants." 42 F.R.D. at 328; *Diaz,* 876 F.2d at 1409.

Requiring notice can also deter frivolous class actions, as the time and cost of effecting notice should make a plaintiff consider carefully the consequences of filing a class claim. *Simer v. Rios,* 661 F.2d at 665. Given the potential cost to themselves, "[t]he notice requirement prevents plaintiffs from appending frivolous, 'boiler plate' class claims or class claims they never intend to litigate." *Diaz,* 876 F.2d. at 1409, *citing Simer,* 661 F.2d at 665; *Shelton,* 582 F.2d at 1310–11; *Muntz v. Ohio Screw Prod.,* 61 F.R.D. 396, 398 (N.D.Ohio 1973); *Yaffe v. Detroit Steel Corp.,* 50 F.R.D. 481, 483 (N.D.Ill.1970).

■ Another concern justifying notice is the prospect of harm to absent class members. After certification "notice of the settlement is necessary as a matter of constitutional due process [as] an individual's claim cannot be extinguished without notice and an opportunity to be heard." *Simer,* 661 F.2d at 664. This due process concern is not present in a putative class action, as a settlement entered prior to class certification lacks res judicata effect as to all but the representative plaintiffs. *Simer,* 661 F.2d at 664–65. Until a class is certified, the interest of putative class members must be classified as speculative. *Magana,* 74 F.R.D. at 69–70.

■ The primary interest of putative class members is their reliance interest in the pending litigation; the primary purpose of notice to the putative class is to inform these individuals that they may no longer rely on the asserted class action vehicle, so

that these putative class members may then commence their own actions. *Id.*

It is generally uncontested that the court approval requirement of Rule 23(e) is absolute,[18] and most of the early decisions on notice similarly found its requirements to be absolute. *See Simer,* 661 F.2d at 664–65 (extensive citations omitted). Despite the fact that the language of Rule 23(e) is mandatory in character, *See Zeffiro v. First Pennsylvania Banking and Trust Co.,* 82 F.R.D. 31, 33 (E.D.Pa.1979) (citations omitted); 7A *Moore's Fed. Prac.* § 1797, at 234,unlike the court approval requirement there is increasing agreement that notice to putative class members of a pre-certification dismissal or compromise is not mandated by Rule 23(e). *Diaz,* 876 F.2d at 1407; *Gupta v. Penn Jersey Corp.,* 582 F.Supp. 1058, 1060 (E.D.Pa.1984), *citing to Shelton,* 582 F.2d 1298, *and Magana,* 74 F.R.D. 61 (additional citations omitted).

While the Third Circuit has not squarely addressed the issue of requiring notice of voluntary pre-certification dismissal, other courts have found room for a more flexible, reasonable approach to notice, which should depend on whether the facts surrounding a compromise or settlement dictate the necessity of notice to prevent Rule 23 abuse, or to protect the interests of putative class members. *Shelton,* 582 F.2d at 1310–11, *citing Magana,* 74 F.R.D. at 67. This interpretation is grounded in the language of Rule 23(e) that notice "shall be given to all members of the class in such manner as the court directs." Fed.R.Civ.P. 23(e); *See Larkin,* 93 F.R.D. at 502. Many courts have broadly interpreted this provision by holding that, given the facts of a particular case, "no notice" may be a permissible form of notice available at the direction of the court. *See Id.*

The rationale behind this interpretation is that an absolute notice requirement, while effectively enforcing the policy of Rule 23, may cause notice to issue unnecessarily when the spirit of Rule 23 is not violated, often at the expense of other important individual and institutional policies. *Simer,* 661 F.2d at 665;

*Larkin,* 93 F.R.D. at 502. Requiring Rule 23(e) notice and full class treatment of every putative class action would be both time consuming and costly. The result of such an absolute rule could harm the potential beneficiaries (the putative class) that the rule was meant to protect. Instead of preventing the filing of frivolous class action suits, the costs of a strictly applied notice rule could prevent meritorious suits from ever being brought. The significant time delay that can be involved in providing notice may also further injure putative class members waiting for the relief that they rightly deserve. *See Id.*

Rather than insist on a narrow, strict interpretation of Rule 23(e), the more enlightened approach adopted by courts "avoids judicial time expenditure and relieves the parties of the expense of notice when it is appropriate, without circumventing the policies of Rule 23(e)." *Gupta,* 582 F.Supp. at 1060, *quoting* H. Newberg, *Class Actions* § 2620 at 240 (1977). This approach as to whether notice is required avoids the very real danger that requiring notice in all situations—even when the risk of collusion and prejudice are clearly negligible—will stifle the beneficial settlement of a case solely because it is pled as a class action. *See Shelton,* 582 F.2d at 1311.

Courts have also held that even absent evidence of prejudice or collusion, notice may still be required whenever the "fair conduct of the action" requires it. *Id.; See, e.g., Larkin,* 93 F.R.D. at 503 ("Because the policies of Rule 23(e) would not be served by ordering notice in this case, it would truly be exalting form over substance to force plaintiff to bear what is in my view a wholly unnecessary burden"). After examining an individual request for dismissal, if it is determined that it does not violate the function of the rule (that neither harm to the class nor evidence of collusion are present), the court may find notice of dismissal to be unnecessary. *Larkin,* 93 F.R.D. at 503.

The rule allowing for dismissal without notice after factual review by the court has come to be called the "Functional Ap-

---

**18.** "[W]hat may not be dispensed with is the district court's approval of the elimination of an uncertified class claim." *Glidden,* 808 F.2d at 627–28.

**442**

proach."[19] It dictates that "if there is no evidence of any collusion between the named plaintiffs and the defendants in seeking the dismissal and no evidence of any prejudice to absent class members," notice to absent class members is not required. *Anderberg*, 176 F.R.D. at 689 (extensive citations omitted).

The court should undertake a careful factual analysis, and require notice only where it would accomplish the dual purposes of class protection and prevention of rule 23(e) abuse. *Magana*, 74 F.R.D. at 68. "A functional approach to the notice requirement is viewed as preferable to a mandatory notice rule in that the difficulties and expense of pre-certification notice can be avoided in those instances where notice would not realistically further the dual aims of Rule 23(e)." *Id.* at 68.

While courts should presume that the possibility of abuse in an individual settlement and class dismissal at the pre-certification stage is sufficient to warrant notice, notice should not be compulsory. *Magana*, 74 F.R.D. at 69. "When notice would be a fruitless yet costly gesture," Rule 23(e) should not be read to compel the parties to incur pointless expense. *Glidden*, 808 F.2d at 627–28.

This approach is in keeping with the policies in favor of settlement, as it will allow settlement of individual claims and dismissal of class allegations without burdensome notice, but only in those circumstances where representative plaintiffs receive proportionate recoveries and the absent class members do not suffer prejudice. *See Diaz*, 876 F.2d at 1409; *Shelton*, 582 F.2d at 1311; 2 *Newberg on Class Actions* § 11.63 at 503, n.407 (2d ed.1985).

The circuit court in *Simer v. Rios* placed discretion in district courts "to assess the prejudice to absent class members caused by the settlement, the institutional costs of notice and a certification hearing, as well as other factors relevant to this determination," including collusion, and then determine whether notice should be required. 661 F.2d at 666. While those guiding words are not binding on this Court, the reasoning behind them is persuasive. As such, this Court has focused its attention on the circumstances surrounding the establishment of the German Foundation, in order to determine whether those circumstances mandate the institution of notice to putative members of the class, prior to the voluntary dismissal with prejudice of the named Plaintiffs' claims.

## C. Dismissal with Prejudice of Plaintiffs' Claims

At the conclusion of the November 13, 2000 hearing, after a thorough review of the affidavits and other documents submitted, the Court ruled that there was absolutely no evidence in the record of collusion, and no real prospect of prejudice to the putative class from allowing dismissal without notice. Having made these findings, the Court declined to require notice, and allowed the representative Plaintiffs to voluntarily dismiss their actions with prejudice. The Court has reached these conclusions for the reasons fully articulated below.[19]

Broadly put, the Court is convinced that dismissal of the putative class actions with prejudice and without notice was the most appropriate course of action, given the absence of collusion, and the negligible risk of harm from dismissal without notice. Additionally, there was a great likelihood that the cost and delay associated with a court mandated notice program would be prejudicial to an aging putative class that sadly grows measurably smaller by the day.[20]

---

**19.** *See* J. Spencer Schuster, note, *Precertification Settlement of Class Actions: Will California Follow the Federal Lead?*, 40 Hastings L.J. 863, 887 (1989); *Anderberg v. Masonite Corp.*, 176 F.R.D. 682, 689 (N.D.Ga.1997); *Magana*, 74 F.R.D. at 68–71.

**19.** The Court explicitly notes that nothing in this opinion should be interpreted as approving the fairness of the Foundation, or as reaching the merits of class certification. As guided by the

decisions in *Diaz* and *Shelton*, this Court has only examined the issues of collusion and prejudice, and their impact on voluntary dismissal in the pre-certification context. *See* 876 F.2d at 1408, 582 F.2d at 1311.

**20.** *See In re Austrian and German Bank Holocaust Litigation*, 80 F.Supp.2d 164, 172 (S.D.N.Y. 2000) (noting that delay would be intolerable and cause certain prejudice to elderly claimants who

Examining first the prospect of collusion, affidavits document that the negotiations, lasting several years, were adversarial and conducted at arm's length. Eizenstat Decl. ¶ 6; Whinston Decl. ¶¶ 1–2; Ratner Decl. ¶ 2; 2nd Neuborne Decl. ¶ 7. These were not closed, back room proceedings designed to benefit only a few. Unlike the typical settlement negotiation in a civil litigation, these talks were conducted under the watchful eye of the international community, and designed to benefit literally millions around the world. *See Id.*

While some Plaintiffs' counsel did in fact serve as negotiators of the settlement, there were in addition numerous governmental and non-governmental actors directly involved in the bargaining process. *Id.* The participation of these third parties, including the numerous victims organizations represented by the Conference on Jewish Material Claims Against Germany, actively protected the interests of the putative class. Eizenstat Decl. ¶ 6. It should be noted that a number of the named Plaintiffs who asked for voluntary dismissal with prejudice in light of the Foundation did not participate in the negotiations leading to the Foundation. Rinehart Decl. ¶ 5. That individuals who did not participate in the negotiations now wish to seek relief undermines any concern about collusion.

Without any evidence to the contrary, a court may accept as sufficient counsels' representations that there has been no collusion or bad faith underlying their motivation in dismissing the class claims. *See Towers Financial Corp.,* 1998 WL 64151 at *1; *Pennsylvania Nurses Assoc. v. Comm. of Pennsylvania,* 1987 WL 109018, *2 (M.D.Pa.) (accepting stipulation of parties, supported by evidence, that collusion is not a factor, where settlement is beneficial to entire class, and where press coverage of the settlement and dismissal was likely to have done away with any reliance interest

that the putative class action might have created). In the cases at hand, in addition to the representations of counsel, the nature of the final agreement itself negates the possibility that the settlement is the product of collusion.

First, it is clear that Defendants did not buy off the class representatives. All victims will recover equally based on the nature of the harm they suffered, via a process that does not differentiate between named Plaintiffs and putative class members. Eizenstat Decl., ¶ 20. While Plaintiffs' counsel did secure a stipend for those named Plaintiffs that dismiss their claims with prejudice, and while putative class members are not eligible to receive this stipend, these payments are not evidence of collusion, nor will they prejudice the putative class.

This stipend was negotiated only after compensation for the entire class had been secured, and will come out of the total amount previously allocated for attorneys fees. Whinston Decl. ¶¶ 3(c), 6; Ratner Decl. ¶ 15.[21] Named Plaintiffs did not breach their fiduciary duty to the putative class in securing the stipend; the individual payments to them merely represent compensation for their individual sacrifices to the class. *Id.* Given that the named Plaintiffs are at present the only parties who have been asked to legally prejudice themselves by dismissing their claims, the amount of the stipends are not disproportionate to what the putative class will eventually receive.

As noted in *Shelton,* mere payment to plaintiffs isn't enough to require notice; only disproportionate payment is. While the amount of the compromise payment is an important fact to be given careful consideration in resolving the possibility of collusion, it should be weighed with all the other circumstances surrounding the settlement. *Shelton,* 582 F.2d at 1315. As the other

---

have already endured decades of waiting for compensation).

21. There seems to be some debate between the parties about whether these stipends will be paid directly to named Plaintiffs out of the Foundation's fund for attorneys fees, or whether they will be paid by each named Plaintiffs' counsel directly to their clients, out of the fees awarded

to counsel by the arbitrators. *See,* Defendants' Response to Plaintiffs' Mot. to Dismiss as to Specific Named Plaintiffs, Annex A at 1. In either event, it is the Court's understanding that these payments will not be made out of the Foundation's funds that have been set aside for victim compensation.

circumstances surrounding the settlement have suitably demonstrated to the Court that the settlement was not the product of collusion, dismissal was appropriate.

Notably, the named Plaintiffs will not be in a substantially better position after the settlement than will absent class members, as aside from the previously discussed stipend they all stand to recover the same amount from the Foundation. Eizenstat Decl. ¶ 20. This settlement is also not entirely about money, as a large component of it is about German Industry accepting responsibility for past injustices, in an effort to provide closure for all. In this regard the money paid to victims, both named and unnamed, is as symbolic as it is beneficial, although it will be of great benefit to those impoverished victims living in Central and Eastern Europe. *See* McCallion/Realuyo Decl. ¶ 4. The Future Fund will also benefit both named Plaintiffs and the putative class, because it is designed to prevent the victimization of others in the future, out of respect for those who have suffered in the past. Eizenstat Decl. ¶ 19; Foundation Law § 2(2).

While it is undeniable that the bargaining power of Plaintiffs was strengthened by the mere presence of class claims, it is arguable that, but for the class claims, no settlement would have been reached, as negotiations would have never commenced. See Eizenstat Decl. ¶ 5. This is evidence not of an abuse of the Rule 23 process, but of the inherent power of the class device, as the attachment of class claims allowed for a comprehensive settlement that benefitted the entire putative class, not just the named Plaintiffs. *See, e.g., Larkin,* 93 F.R.D. at 503. The class claims in these cases were not merely "boiler plate," added in an effort to get a quick, advantageous settlement for the

named Plaintiffs, but genuine causes of action that Plaintiffs intended to fully litigate on behalf of the entire class.[22] *See Diaz,* 876 F.2d at 1409 (Absent indication that class allegations were appended only to get favorable individual settlements, there is no reason to require notice as a deterrent to hypothetical abusive plaintiff).

It was also readily apparent to the Court that this settlement was not reached solely to obtain attorneys fees. Counsel for Plaintiffs repeatedly evidenced a motivation to secure adequate benefits for the entire group of victims, as opposed to securing compensation only for themselves or for the named Plaintiffs. Statement of Interest, at 23. Plaintiffs' attorneys will only be eligible to receive approximately 1.25% of the total pot, which is exceedingly low for cases brought as class actions. *See In re Holocaust Victim Assets Litigation,* 105 F.Supp.2d 139 (E.D.N.Y. 2000) (finding settlement agreement that provided for attorneys fees capped at 1.8% to be fair and reasonable); Eizenstat Decl. ¶ 19; Statement of Interest, at 23. As all claims of attorneys for fees must go to an arbitrator, no individual attorney have assurances of what they will receive; only that it will be proportionately much less than 1.25% of the total settlement set aside for all attorneys. *See Magana,* 74 F.R.D. at 72 ("Control of Plaintiff's Counsel's Attorney's Fee as Primary Means of Preventing Rule 23 Abuse"). Noting also that these fees were only negotiated after compensation for the entire class had been agreed upon, Whinston Decl. ¶ 4; Ratner Decl. ¶ 14, and that they will be paid out of a separate fund, Eizenstat Decl. ¶ 19, it strikes the Court as entirely improbable that the fees for Plaintiffs' attorneys were

---

**22.** In this regard the Court is reminded of the remarks of Rudolph Van Jhering, who wrote "[t]he struggle for law is the duty of a person having rights, to himself. And the assertion of one's legal rights is a duty which he owes to society. Concrete law not only receives life and strength from abstract law, but gives it back, in turn, the life it has received. It is of the nature of the law to be realized in practice. A principle of law never applied in practice, or which has lost its force, no longer deserves the name. Under the circumstances, the lot of the few who have the courage to enforce the law becomes a real martyrdom. Their strong feeling of legal right, which will not permit them to quit the field, becomes a curse to them. The defense of one's concrete legal rights, when these rights are attacked, is a duty of the individual whose rights had been invaded, not only to himself, but also to society. If what I have said be true, that in defending his legal right he, at the same time, defends the law, and in the law that public order, which is indispensable, who can deny that, in defending them, he fulfills a duty to the commonwealth?" *The Struggle for Law,* at ___ (1925).

the motivating factor behind the entire agreement.

Since notice in these cases was clearly not required to prevent the collusive abuse of Rule 23, the only matter left for the Court to determine is whether dismissal of the named Plaintiffs' claims without notice would prejudice members of the absent class. Because the settlement came prior to the certification of class claims, legal prejudice could not attach to the putative class members, who are not bound by the dismissal of the individual claims with prejudice. *Diaz*, 876 F.2d at 1408. In these cases, legal prejudice will attach to the putative class members only after they have collected from the Foundation, for at that point they will be asked to sign waivers, taking away their right to sue German Industry. Statement of Interest, at 23; Foundation Law § 16(2).

Putative class members may also be prejudiced where an action upon which they relied for recovery is terminated without their knowledge. *Diaz;* 876 F.2d at 1408. Prejudice can also result if a rapidly approaching statute of limitations precludes an adequate time for plaintiffs to file their complaints. *Id.*

The *Shelton* court noted that since no notice is required to purported class members when an action is initially filed, any reliance on the part of putative class members must arise as a consequence of media coverage or some other secondary information. 582 F.2d at 1315. Courts will typically find reliance by putative class members only in those cases that generate media coverage. *Id.* Reliance will also be limited to those individuals who are legally savvy enough to appreciate the legal implications of a purported class action on their private rights of action. *Id.* A court should consider the relevant facts and circumstances of a particular case when examining whether the speculative reliance interest of absent putative class members is sufficiently important to necessitate class notice. *Shelton* at 1315 (noting that the courts in *Berse v. Berman*, 60 F.R.D. 414–417 (S.D.N.Y.1973); and *Elias v. National Car Rental System, Inc.*, 59 F.R.D. 276, 277 (D.Minn.1973), followed this practice).

After a review of the materials presented to it, the Court has found that any reliance by absent putative class members is speculative and negligible at best, and is not sufficiently important to necessitate class notice. While the media coverage surrounding the existence of these cases might have been sufficient to create a reliance interest, more recent media coverage has repeatedly stated that implementation· of the Foundation is expressly contingent on the termination of all rights of action in the courts of the United States. *See* Ratner Decl. ¶¶ 2–11; *See Pennsylvania Nurses Assoc.*, 1987 WL 109018, at *2.

The Court concludes that any putative class member legally savvy enough to appreciate the impact of a pending putative class action on their rights would similarly appreciate the impact of the termination of all actions pending in the United States on their rights. The court is not concerned that such individuals will fail to become aware of information about the settlement, as any putative class members who may have come to rely on these cases will almost certainly be touched by some facet of the extensive publicity programs that are presently being put into effect. Eizenstat Decl. ¶ 24; 2nd Neuborne Decl. ¶ 13; Statement of Interest at 22–23.

The concerns about the expiration of a statute of limitations articulated in the *Diaz* decision are also of minimal concern here, as all of the cases stem from alleged conduct that occurred more than 55 years ago. *See Diaz*, 876 F.2d at 1411 (notice held to be required as there was little time left between dismissal of the putative class and the expiration of the statute of limitations); *cf. American Pipe and Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) (holding that the filing of a class action tolls the statute of limitations on all individual claims covered by the class).

Without reaching or commenting upon the merits of any claims that could be brought by putative class members, the Court notes that any putative class members who wish to pursue legal action could face a serious uphill battle en route to recovery, in light of the decisions in *In re Holocaust Victim Assets Litigation*, 105 F.Supp.2d 139, *Burger–*

*Fischer,* 65 F.Supp.2d 248, *Iwanowa,* 67 F.Supp.2d 424, and the unpublished decision in *Josef Tiber Deutsch, et al. v. Turner Corp., et al.,* CV 00–4405 SVW (C.D.Cal.2000). That the United States is required by the Executive Agreement to file a Statement of Interest in support of dismissal in any new case that may be brought could also make recovery more difficult. Eizenstat Decl. ¶ 14; Executive Agreement, Art. 2 & Annex B.

Potential Plaintiffs would likely have to prove to a court's satisfaction that the applicable statutes of limitations did not run decades ago. While there may exist the prospect of some additional delay to those Plaintiffs because notice has not been directly provided to them, it is the opinion of the Court that it will not result in prejudice sufficient to justify the requirement of notice, especially given the real prejudice that would result if notice were compelled.

Not only have courts declined to require notice in a pre-certification class action where the facts fail to show that prejudice would result from a lack of notice, *Robinson v. First National City Bank,* 482 F.Supp. 92, 100 (S.D.N.Y.1979); *Jaen v. New York Telephone Co.,* 81 F.R.D. 696 (S.D.N.Y.1979), but as previously discussed, in *Simer,* the Seventh Circuit held that the "absolute application of Rule 23(e) and the reasoning behind such an absolute rule may prove too much, often at the expense of other important individual and institutional policies." 582 F.2d at 665; *See also Robinson,* 482 F.Supp. at 100 (declining to require notice where cost of providing notice would prove more prejudicial than absence of it). The cases before the Court have presented just such a circumstance, where the delay of dismissal pending imposition of notice would have directly resulted in prejudice to the putative class.

This prejudice partially stems from the fact that no one in the putative class can recover from the Foundation until ALL pending claims in the courts of the United States have been dismissed with prejudice. *See* Chrobog Letter, at 3. Members of the putative class would benefit more from the expeditious dismissal of all pending actions so that they can recover than they would

from any delay so that additional notice can be implemented. The prospect of this delay is particularly unconscionable when one considers that members of the putative class are aged and dying. *See In re Austrian and German Bank Holocaust Litigation,* 80 F.Supp.2d at 172; Joint Statement ¶ 2. As all of the claims stem from wrongs which were committed 55 years ago, more delay for the implementation of notice provisions which would be of questionable value is unacceptable to the Court.

Notice would also be unduly burdensome because of the great cost of notice to plaintiffs. The putative class numbers in the millions, is located on several continents, and speaks a multitude of languages. Asking named Plaintiffs to pay for even rudimentary notice by publication in these countries would require them to incur great cost. Such provisions would also be completely redundant, given that the Foundation has launched an unprecedented publicity program to make the right of recovery from the Foundation known.

As courts have previously dispensed with notice in circumstances where the difficulties and expense of pre-certification notice outweigh the slight risk of harm to the putative class, *See Sikes v. AT & T,* 841 F.Supp. 1572, 1579 (S.D.Ga.1993), the Court has found no reason not to allow voluntary dismissal with prejudice and without notice in the present cases. Given the fact that the imposition of notice would be injurious to the very putative class whose interests the Court must protect, the Court declines to order notice, as the inherent delay would work a final injustice to a great many members of that putative class.

### D. *Rule 60(b)*

Finally, of great concern to Plaintiffs in these actions is the prospect that full funding of the Foundation might never be achieved, and that as a result they would have dismissed their claims with prejudice for nothing. McCallion/Realuyo Decl. ¶ 4; 2nd Neuborne Decl. ¶ 15 n.5. The Court shares this understandable concern, and for this reason all of the Orders of Dismissal (with the consent of the parties) were made expressly subject to Federal Rule of Civil Procedure

60(b). Rule 60(b) provides that a court may relieve a party from a final judgment or order for circumstances such as fraud, mistake, misrepresentation, or any other such reason justifying relief from the operation of the judgment or order. Fed.R.Civ.P. 60(b).

Pursuant to Rule 60(b), should the Foundation not achieve full funding, Rule 60(b) would provide the Plaintiffs who have dismissed with prejudice their complaints in reliance on full funding with an avenue for relief. Given the commitment to the Foundation by the Federal Republic of Germany and by German Industry, many companies of which were not in existence during the Nazi era, an application under F.R.C.P. 60(b) is most unlikely.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' motions to voluntarily dismiss their actions with prejudice have been **granted.** Appropriate Orders have previously been entered in those cases listed in Appendix A to this opinion.

The historical significance of the resolution of these cases invites the Court to make the following personal observations:

Reading the allegations in the Complaints and the Joint Statement on occasion of the final plenary meeting concluding international talks on the preparation of the Foundation "Remembrance, Responsibility and the Future," the Court is reminded of Kierkegaard's observation that "[l]ife can only be understood backwards but it must be lived forwards."

The allegations in the Complaints personalize the belief of Omer Bartov that "the Holocaust is indeed a crucial event for Western civilization, and that however much we learn about other instances of inhumanity, we cannot avoid the fact that this genocide, in the heart of our civilization, perpetrated by one of its most important nations (with the collaboration or complicity of many others), can never be relegated to a secondary place." Omer Bartov, *Mirrors of Destruction, War, Genocide and Modern Identity* 6 (Oxford Univ. Press 2000).

As Bartov observes, "[t]he carnage and genocide of World War II that followed did more than shatter the dreams of military and national greatness, it dealt a lethal blow to the very idea of shared humanity. Half a century later we are still groping for a way to come to terms with the belated effects of this trauma, even as it's last witnesses are leaving the stage." *Id.* at 45.

While the Complaints and Bartov's comments look to the past, the Joint Statement looks to the past and the future. This historic document is signed not only by the parties to the litigation but by the Republic of Belarus, The Czech Republic, the State of Israel, the Republic of Poland, the Russian Federation, and Ukraine, together with the Government of the United States of America and the Federal Republic of Germany as well as the Conference on Jewish Material Claims against Germany.

The Joint Statement acknowledges "the intention of both the Government of the Federal Republic of Germany and German companies to accept moral and historical responsibility arising from the use of slave laborers, and from property damage suffered as a consequence of racial persecution and from other injustices of the National Socialist era and World War II," and notes "with appreciation the December 17, 1999, statement of the President of the Federal Republic of Germany paying tribute to those who were subjected to slave and forced labor under German rule, recognizing their suffering and the injustices done to them, and begging forgiveness in the name of the German people." Statement of Interest, at 2.

In formulating the framework for the Foundation "Remembrance, Responsibility and the Future," the participants have provided a mechanism for payments to hundreds of thousands of slave and forced laborers, following the initiative of German companies to establish a foundation, which has since been joined by thousands of other German companies. But within the Foundation itself is a "Remembrance and Future Fund" charged with the permanent task "to foster projects that serve the purposes of better understanding among peoples, the interests of survivors of the National Socialist regime, youth, exchange, social justice, remembrance of the threat posed by totalitarian systems

and despotism, and international cooperation in humanitarian endeavors." Foundation Law § 2(2). It is this commitment that grounds our confidence in Kierkegaard's words, that "life must be lived forwards."