317 F.3d 91
 In re AUSTRIAN AND GERMAN BANK HOLOCAUST LITIGATION.
Walter Steven Zeisl, Plaintiff-Appellant,
v.
Harold Watman, on behalf of himself and all other persons similarly situated, et al., Plaintiffs-Appellees,
Lieff, Cabraser, Heimann & Bernstein, LLP, et al., Real-Parties-in-Interest-Appellees,
Burt Neuborne, Appellee-Cross-Appellant.
 Docket No. 01-9193L.
 Docket No. 01-9229(CON).
 United States Court of Appeals, Second Circuit.
 Argued: September 11, 2002.
 Decided: January 3, 2003.
 
 E. Randol Schoenberg, Los Angeles, CA (Richard A. Roth, Littman Krooks & Roth, P.C., New York, N.Y., on the brief), for Plaintiff-Appellant.
 Lawrence Kill, Anderson Kill & Olick, P.C., New York, N.Y. (Robert A. Swift, Kohn Swift & Graf, P.C., Philadelphia, Pa.; Edward D. Fagan, Livingston, N.J.; Carey R. D'Avino, New York, N.Y.; Michael Witti, Monchen, Germany; Stephen A. Whinston, Edward W. Millstein, Berger & Montague, P.C., Philadelphia, Pa.; Richard Appleby, New York, N.Y.; Mel Urbach, Jersey City, N.J.; J. Dennis Faucher, Miller Faucher Caferty and Wexler LLP, Philadelphia, Pa., on the brief), for Plaintiffs-Appellees.
 Morris A. Ratner, New York, N.Y. (Elizabeth J. Cabraser, Caryn Becker, Lieff, Cabraser, Heimann & Bernstein, LLP, on the brief), for Real-Party-in-Interest-Appellee Lieff, Cabraser.
 Burt Neuborne, New York, N.Y., for Appellee-Cross-Appellant.
 Before: NEWMAN and F.I. PARKER, Circuit Judges; and UNDERHILL,* District Judge.
 Judge F.I. PARKER concurs in the result with a separate opinion.
 JON O. NEWMAN, Circuit Judge.
 
 
 1
 This appeal concerns a claim that attorney's fees paid to lawyers for services rendered in connection with the creation of a multi-billion dollar fund to compensate victims of the Holocaust should be forfeited because of an alleged conflict of interest. Walter Steven Zeisl appeals from the October 1, 2001, order of the District Court for the Southern District of New York (Shirley Wohl Kram, District Judge) denying his forfeiture petition for lack of jurisdiction. We conclude that jurisdiction is available, that the appropriateness of exercising such jurisdiction is in substantial doubt, and that, in any event, no basis for fee forfeiture exists. We therefore affirm.
 
 Background
 
 2
 In November 1998, a class action complaint was filed in the United States District Court for the Eastern District of New York against certain Austrian banks.[1] The complaint alleged that between 1929 and 1946, the defendant banks had unlawfully appropriated and converted the plaintiffs' assets and labor as part of the Nazi program of Aryanization. Other actions against German and Austrian banks were filed in the Eastern and Southern Districts around the same time. See In re Austrian and German Bank Holocaust Litigation, 80 F.Supp.2d 164, 167-68 (S.D.N.Y.2000) ("Austrian I") (approving settlement of claims against Austrian banks), aff'd sub nom. D'Amato v. Deutsche Bank, 236 F.3d 78 (2d Cir.2001). In December 1998, these actions were transferred to the Southern District of New York, assigned to Judge Kram, and, in February 1999, consolidated for all purposes. Id. at 168.
 
 
 3
 In March 1999, the plaintiffs filed a consolidated class action complaint ("Consolidated Complaint"[2]) against several German banks and two Austrian banks, Bank Austria AG and Creditanstalt AG ("Austrian banks"). Id. The complaint stated that "Plaintiffs seek recovery from the German Bank Defendants, Deutsche Bank and Dresdner Banks, both for their own conduct during the class period, and also to the extent that they controlled various Austrian banks during the Holocaust." This complaint was filed two days after agreement was reached to settle claims against the Austrian banks.
 
 
 4
 The Austrian Settlement. In December 1998, Judge Kram appointed Alphonse D'Amato as Special Master to assist in settlement negotiations. Id. In March 1999, the plaintiffs and the Austrian banks reached an agreement on settlement terms ("Austrian Settlement"). Id. at 169. The Austrian Settlement required the Austrian banks to pay $40 million to the putative plaintiffs settlement class for payment of claims, administrative expenses, and fees, and to establish a historical commission that would report on the Naziera activities of the Austrian banks. Id. It also provided, especially pertinent to the pending appeal, that the Austrian banks would assign to the settlement class all claims that the Austrian banks might have "arising out of or relating to any acts of the Austrian [b]anks, including those from January 1, 1938 through December 31, 1946 against any financial institution or commercial enterprise that may have exercised dominion or control over any of the Austrian [b]anks" ("Assigned Claims"). Id. at 171. It was subsequently explained that the Assigned Claims primarily concerned claims against German banks that had controlled the Austrian banks and allegedly looted their assets. The Austrian Settlement stated that the Assigned Claims would be assigned to "the Class, which for purposes of addressing such claims shall be represented by Class Counsel." "Class Counsel" were stated to be 17 attorneys and law firms, but only 11 of the listed attorneys and law firms signed the Austrian Settlement.
 
 
 5
 To effectuate the settlement, the parties sought certification of a settlement class. In June 1999, the District Court granted preliminary certification of the settlement class. Id. at 169. At a hearing to determine whether the proposed settlement was fair, reasonable, and adequate, Robert Swift, co-lead counsel for the plaintiffs, described the settlement as a door-opening settlement ... a partial settlement of the overall litigation ... on behalf of a subset of all persons described in the consolidated amended complaint.... We are hopeful that, as a door-opening settlement, it will encourage other defendants to resolve their disputes, and I would note for the Court that there are ongoing negotiations being conducted by Deputy Treasury Secretary Eizenstadt and Count Lambsdorf of Germany to try to encourage that....
 
 
 6
 Swift raised the assignment of claims as one of the benefits of the settlement, suggested that the claims might be worth as much as $300 million, and noted that "our plaintiffs, our clients, and the rest of the Austrian bank class maintain [the assigned] claims against the German banks.... So it is not right to look at the $40 million as a complete settlement." Special Master D'Amato testified that the
 
 
 7
 value of these assigned claims is uncertain, because they have not been pursued in litigation and because talks with the German banks are still ongoing. At least, however, the assignment will provide an additional basis for the German banks' liability and, indeed, plaintiffs' counsel have raised the matter of this assignment and the ongoing negotiations with the German bank defendants.
 
 
 8
 In January 2000, the District Court certified the settlement class ("Austrian Settlement Class"), approved the settlement, and dismissed all claims with prejudice against the Austrian banks. Id. at 180-81. In approving the settlement, the Court relied in part on the purported value of the Assigned Claims.
 
 
 9
 The German Compact. In the fall of 1998, the German Government asked then Under Secretary of State for Economic Affairs Stuart Eizenstadt to facilitate a comprehensive resolution of the many class actions then pending in federal and state courts in the United States against various German entities for wrongs committed during the Nazi era. See In re Nazi Era Cases Against German Defendants Litigation, 198 F.R.D. 429, 431 (D.N.J.2000) ("Nazi Era Cases"). A series of negotiations commenced. Participants included lawyers for the plaintiffs and defendants in the various pending class actions, the Government of Germany, six other governments including the Government of Israel, and non-governmental organizations. Id. at 431-32. In July 2000, these negotiations culminated in an agreement ultimately reflected in three key documents, referred to in this litigation individually as "the Joint Statement," "the Governmental Agreement," and "the German Law," and collectively as "the German Compact."
 
 
 10
 The Joint Statement[3] contemplated the establishment of a German foundation to be known as "Remembrance, Responsibility and the Future." The Joint Statement was signed by various participants in the negotiations, including government officials and lawyers who participated in the negotiations. The Joint Statement included a recognition that "it would be in the participants' interests for the Foundation to be the exclusive remedy and forum for the resolution of all claims that have been or may be asserted against German companies arising out of the National Socialist era and World War II." It also provided that "counsel for the plaintiffs will file motions or stipulations to dismiss with prejudice all lawsuits they have filed currently pending in U.S. courts against German companies arising out of the National Socialist era and World War II...."
 
 
 11
 The Governmental Agreement between the United States and the Federal Republic of Germany[4] provided that, in any case brought in a court in the United States against German entities for Nazi era acts, the United States would file a "Statement of Interest" informing the court that dismissing the case with prejudice would serve important United States foreign policy interests.
 
 
 12
 The German Law[5] established the Foundation. The German Law set forth the governing structure of the Foundation, defined the overall endowment and allocation of Foundation funds, and established criteria for payment. Pertinent to the pending litigation, the German Law specifically excluded from payment "cases in which claims have been transferred to third persons by operation of law, transition, or a legal transaction," language that appears on its face to apply to the Assigned Claims. Among the purposes for which Foundation funds were authorized was payment of attorney's fees.
 
 
 13
 Dismissal of the Consolidated Class Action. In October 2000, plaintiffs filed a motion for voluntary dismissal of the Consolidated Complaint.[6] In March 2001, the District Court denied the motion on several grounds. In re Austrian and German Bank Holocaust Litigation, No. 98 CIV 3938 SWK, 2001 WL 228107 (S.D.N.Y. Mar.8, 2001). One set of grounds concerned what the Court perceived to be deficiencies in the German Compact. The Court noted (1) that the Joint Statement contemplated that the German Foundation was intended to be the exclusive forum for resolution of all claims against German companies arising out of the Nazi era; (2) that the Foundation was not then fully funded; and (3) that although the proposed dismissal was to be without prejudice to absent class members, any lawsuit they might bring in the United States would precipitate the filing of a Statement of Interest by the United States urging dismissal in the foreign policy interests of the United States, and such a filing would "most likely" lead to dismissal of such a lawsuit. Id. at *5-*7. As "an additional and independent grounds" for denying dismissal, id. at *7, the Court pointed out that the German Compact made no provision for any payments with respect to the Assigned Claims, thereby relegating holders of such claims to lawsuits that would likely be defeated by the filing of the Government's Statement of Interest, id. at *7-*8. The District Court denied plaintiffs' motion for reconsideration, and reasserted its view that dismissal would unfairly prejudice the holders of the Assigned Claims.
 
 
 14
 The plaintiffs then petitioned this Court for a writ of mandamus ordering Judge Kram to grant dismissal. While the petition was pending, Michael Hausfeld, one of the counsel for the plaintiffs, submitted a declaration to the District Court detailing steps he would take to protect the value of the Assigned Claims through Foundation mechanisms ("Hausfeld Declaration"). In May 2001, the District Court reconsidered its previous orders and granted voluntary dismissal. However, Judge Kram's dismissal order included language noting the plaintiffs' intention to seek relief pursuant to Rule 60(b) of the Federal Rules of Civil Procedure if the "assumptions" in the Hausfeld Declaration concerning pursuit of the Assigned Claims were not "realized," and the order provided that the plaintiffs could move to vacate the dismissal order under Rule 60(b) if "the eligibility criteria of the German Foundation ... are not revised as contemplated in the Hausfeld Declaration."
 
 
 15
 The plaintiffs then renewed their request to this Court for a writ of mandamus, specifically requiring Judge Kram to remove from her dismissal order the new language that the plaintiffs apprehended would subject the dismissal to reopening in the event that the German Foundation did not honor the Assigned Claims. We issued mandamus and instructed the District Court to delete the language of the dismissal order to which the plaintiffs objected. Duveen v. United States District Court for the Southern District of New York, 250 F.3d 156 (2d Cir.2001). We understood the challenged language "seemingly [to] require[ ] the German legislature to make a finding of legal peace," id. at 164, and to "appear[ ] to indicate that if the German legislature failed to change German law, the district court could or would vacate these dismissals," id. at 165. Relying on separation of powers principles, we ruled that the District Court lacked power to require action by the legislature of a foreign sovereign and that a legislature's refusal to act "is not a valid ground for vacatur of a final judgment." Id. In May 2001, Judge Kram issued an amended order complying with our Court's ruling.[7]
 
 
 16
 The Fee Award. In July 2000, on the same day that the Joint Statement was signed, officials of the United States and Germany signed a one page letter addressed to the "plaintiffs' attorneys participating in the negotiations" to "confirm our understanding" of how attorney's fees for services rendered in the negotiations resulting in the creation of the Foundation would be resolved. The letter stated that between 100 million and 125 million DM would be set aside for fees from the administrative budget of the Foundation and would be allocated to individual attorneys by two arbitrators. The German Law promulgated in August 2000 explicitly contemplated payment of attorney's fees to counsel whose activities had contributed to the establishment of the Foundation, the total amount to be determined by the Foundation and allocated among counsel through arbitration. On June 14, 2001, the arbitrators, Kenneth R. Feinberg and Nicholas deB. Katzenbach, recommended awards totaling 124 million DM to 278 plaintiffs and 51 attorneys, and this sum was approved by the Foundation's Board of Trustees on June 21, 2001. This award amounted to approximately one percent of the German Foundations's initial assets.
 
 
 17
 No fees have thus far been sought from the District Court for services rendered in connection with the Austrian Settlement.
 
 
 18
 The Fee Forfeiture Motion. The approval of the arbitrators' fee recommendations by the German Foundation led immediately to steps by Zeisl and others to block payment of $42 million of such fees scheduled to be received by counsel for the Austrian Settlement Class and ultimately to seek forfeiture of this sum in the event of payment. Their objection, which we consider at length in Part III, infra, was essentially that Class Counsel had violated a duty of undivided loyalty to members of the Austrian Settlement Class by agreeing to the plan for the German Foundation. Their specific objection was that because the German Foundation did not provide for any compensation of the Assigned Claims and the Governmental Agreement will hinder any further prosecution of those claims in United States courts, Class Counsel's negotiation and acceptance of the German Compact effectively abandoned the Assigned Claims, in violation of a duty to the Class, in order to benefit their other clients.
 
 
 19
 On June 22, 2001, Zeisl applied ex parte for an order restraining the arbitrators from distributing the $42 million of fee awards to counsel for the Austrian Settlement Class until a petition for fee forfeiture was resolved.[8] In Judge Kram's absence, the application was heard by Judge Cote, who denied it the same day after a hearing. Judge Cote ruled that the District Court likely lacked jurisdiction to interfere with the German Foundation, that the Court likely lacked jurisdiction to resolve a claim of an ethics violation brought under New York law, that the likelihood of success on the merits was low, and that there would be no irreparable harm in allowing the funds to be disbursed.
 
 
 20
 On July 12, 2001, Zeisl filed the petition for fee forfeiture that is the subject of the pending appeal. He purported to act for himself and on behalf of all members of the Austrian Settlement Class. Zeisl renewed the contention that Class Counsel for the Austrian Settlement Class had violated their duty of undivided loyalty to the Class by agreeing to the effective nullification of the Assigned Claims in connection with the German Compact. He also sought an order precluding Class Counsel from seeking court-awarded fees in the Austrian banks class action. In an order entered October 1, 2001, Judge Kram denied the petition for lack of jurisdiction, relying on this Court's mandamus decision in Duveen. Judge Kram denied the motion to preclude an application for fees in the Austrian banks class action as "untimely" because no application had been filed.
 
 Discussion
 
 21
 The attempt to require forfeiture of the $42 million in fees awarded by the arbitrators under the auspices of the German Compact to counsel for the Austrian Settlement Class poses issues as to the District Court's jurisdiction, the appropriateness of exercising whatever jurisdiction exists, and the merits of the forfeiture contention. We consider these issues in turn. Preliminarily we note that the request to preclude payment of court-awarded attorney's fees for services rendered in the Austrian banks class action was properly denied as premature. See City of Detroit v. Grinnell Corp., 495 F.2d 448, 474 (2d Cir.1974) ("Since none of [the challenged] fees has as yet been allowed, this question is not yet ripe for review....").
 
 I. Jurisdiction
 
 22
 Appellees contend that the District Court lacked jurisdiction to entertain Zeisl's forfeiture petition because the Consolidated Complaint had been dismissed without any reservation of continuing court authority. They rely on Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994), which held that a district court lacks ancillary jurisdiction to enforce a settlement agreement after the underlying lawsuit has been dismissed unless the parties agree to such continuing authority or the court retains jurisdiction for such purpose. Id. at 381-82, 114 S.Ct. 1673. In Appellees' view, because the fees were provided pursuant to the German Compact, any review of fees would constitute a review of the Compact, which would amount to an attempt to enforce a settlement in violation of Kokkonen.
 
 
 23
 This argument appears to blend two distinct issues: whether the fee forfeiture is a request to enforce or supervise the German Agreement and even if it is not, whether adjudicating the forfeiture petition would inevitably require some consideration of the propriety of action taken under the auspices of the German Compact, thereby arguably making the exercise of jurisdiction inappropriate. The first issue, under Kokkonen, is properly an issue of ancillary jurisdiction. The second, which we consider in Part II, infra, concerns the appropriateness of exercising jurisdiction.
 
 
 24
 Whenever a district court has federal jurisdiction over a case, it retains ancillary jurisdiction after dismissal to adjudicate collateral matters such as attorney's fees. In Cooter & Gell v. Hartmarx, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990), the Supreme Court held that a court retains jurisdiction to impose Rule 11 sanctions even after the plaintiff voluntarily dismisses the complaint. Id. at 394-95, 110 S.Ct. 2447. The Court noted:
 
 
 25
 It is well established that a federal court may consider collateral issues after an action is no longer pending. For example, district courts may award costs after an action is dismissed for want of jurisdiction. This Court has indicated that motions for costs or attorney's fees are `independent proceeding[s] supplemental to the original proceeding and not a request for a modification of the original decree.' Thus, even `years after the entry of a judgment on the merits' a federal court could consider an award of counsel fees.
 
 
 26
 Id. at 395, 110 S.Ct. 2447 (citations omitted) (emphases added). See Chesley v. Union Carbide Corp., 927 F.2d 60, 64 (2d Cir.1991); Cluett, Peabody & Co. v. CPC Acquisition Co., 863 F.2d 251, 256-57 (2d Cir.1988).[9]
 
 
 27
 It does not matter, for purposes of ancillary jurisdiction, that the District Court did not authorize the attorney's fees being challenged. Courts may order attorneys to return fees the client has paid pursuant to contract.[10] See In re Taylor, 511 A.2d 386, 386 (D.C.1986) (ordering attorney to refund fees paid by client). To the extent that the forfeiture petition seeks to impose discipline for an alleged violation of professional responsibilities, the District Court had ancillary jurisdiction to consider exercising the "inherent power" of federal courts to discipline attorneys practicing before them. See In re Corn Derivatives Antitrust Litigation (Appeal of Koerner & Co.), 748 F.2d 157, 160 (3d Cir.1984).
 
 
 28
 The Appellees contend that whatever ancillary jurisdiction is normally available to consider fee issues is precluded in this case because, in their view, Zeisl's application would require the District Court to supervise the German Compact, in violation of Kokkonen. We disagree. Zeisl is not seeking to implement any aspect of the German Compact or any of its constituent parts. He is not contending, as did the claimants in Kokkonen, that some provision of a settlement (here, the Compact or its components) obligates the Appellees to take the action he seeks. Rather, Zeisl merely seeks to adjudicate a lawyer's entitlement to retain fees earned, at least in part, for services rendered in connection with a case within a district court's jurisdiction.[11]
 
 
 29
 Nor is ancillary jurisdiction precluded because the fees have been awarded under the auspices of an international arrangement. To hold otherwise would excessively withdraw attorney conduct from traditional court scrutiny. In an era of globalization, it is to be expected that lawyers rendering services in connection with lawsuits in district courts will on occasion be awarded fees under the auspices of various foreign judicial and arbitral tribunals and pursuant to various international arrangements. It is likely that those making such fee awards will consider only the amount of fees to be awarded, as apparently was true of the arbitrators in this case, and will understandably not be concerned with any limitations imposed by our domestic standards concerning lawyers' professional responsibilities. Such matters are peculiarly within the purview of domestic courts, with familiarity of and responsibility for observance of professional codes of conduct. We decline to preclude the existence of ancillary jurisdiction over fee issues otherwise within federal jurisdiction solely because the amount of the fees has been determined under the auspices of international arrangements.
 
 
 30
 The District Court ruled that ancillary jurisdiction was lacking solely because of our decision in Duveen. We cannot fault the Court for taking our issuance of mandamus as a direction to relinquish all further jurisdiction in this case, but we think the Court has overread our ruling. The core problem that prompted the issuance of mandamus in Duveen was that a federal court, by attaching conditions to the dismissal of a case, appeared to be ordering a foreign legislature to take action. We viewed such conditions as beyond the competence of a federal court and as an obstruction to the finalization of an arrangement that the Executive Branch of the United States had helped negotiate. Those concerns are not implicated by Zeisl's motion, at least not so directly as to preclude the existence of ancillary jurisdiction.
 
 
 31
 The attorney's fees have been fully disbursed. Precluding the attorneys from retaining such fees would not require or prohibit any action by the German legislature or the Foundation.[12] Nor would doing so frustrate the essential purposes for which the United States and Germany entered into the Governmental Agreement. Those purposes were to secure compensation for Holocaust victims and to obtain the "legal peace" that was understood to be necessary to obtain such compensation.
 
 
 32
 We conclude that the District Court did not lack ancillary jurisdiction to consider the fee forfeiture petition.
 
 
 33
 II. Appropriateness of Exercising Ancillary Jurisdiction
 
 
 34
 Whether it was appropriate for the District Court to exercise ancillary jurisdiction over the forfeiture petition is a somewhat closer question. The matter is complicated by the unusual circumstances of the litigation. The Consolidated Class Action began, procedurally at least, as a traditional Rule 23 lawsuit against the German banks. It ended, however, with a voluntary dismissal sought to enhance the prospects for implementing an extraordinary extra-judicial remedy of historic proportions, a dismissal virtually compelled by the provision of the Joint Statement that the contribution of DM 5 billion from German companies to the German Foundation would not begin until pending lawsuits, including the Consolidated Class Action, were dismissed. In this unusual context, Zeisl's claim of unprofessional conduct by the Austrian Settlement Class Counsel poses substantial risks of propelling the District Court into a dubious inquiry concerning several delicate issues within the framework of the negotiations that resulted in the German Compact.
 
 
 35
 These risks are exacerbated by the way Zeisl framed his allegations of unprofessional conduct. His essential claim in the District Court was that Class Counsel "violated their ethical and fiduciary obligations of undivided loyalty to the Austrian Bank [Settlement] Class when they agreed to the German Bank settlement[13] in which they impaired the Austrian [settlement] Class members' rights" by giving up the Assigned Claims. Memorandum in Support of Motion to Forfeit and Preclude Payment of Fees at 11 ("Zeisl Memorandum"). The District Court could not assess that allegation without exploring the negotiations, not only between the victims and the German banks but also between the United States and German governments. Over the course of these negotiations, it became clear that the German contributors to the DM 10 billion fund, with the full support of the German legislature, were unwilling to provide any payments to anyone who was not a direct victim of the Holocaust, i.e., to deny Foundation funds to assignees of the claims of the Austrian banks. Because of that unwillingness, any assessment of the professional obligation of Austrian Settlement Class Counsel in agreeing to the German Compact would require examination of the risks to the establishment of the fund and the reasonableness of opposing the strongly asserted view of the United States that pursuit of the Assigned Claims within the German Compact should not be permitted to derail the entire enterprise.
 
 
 36
 We have previously recognized that the existence of ancillary jurisdiction to adjudicate a fee dispute after the dismissal of a lawsuit calls for the sound exercise of a district court's discretion whether to entertain the merits of the dispute, and, in a case overlaid with international comity considerations, have ruled that it would exceed a court's discretion to do so. Chesley, 927 F.2d at 65-68. In the pending case, we have substantial doubts whether, even on the assumption that ancillary jurisdiction was available, it would have been an appropriate exercise of such jurisdiction for the District Court to assess the professional propriety of counsel's negotiating stance in the circumstances disclosed on this record. Although there is some support within this panel for affirming the denial of forfeiture simply on the basis that exercise of ancillary jurisdiction was beyond the discretion of the District Court, there is also some support for considering the merits, at least as an alternative basis for decision. We therefore proceed to the merits.
 
 III. The Merits of the Forfeiture Claim
 
 37
 An initial issue concerning the merits of the forfeiture claim is the identity of the counsel who are even arguably within the scope of any plausible claim. Zeisl broadly seeks forfeiture of the fees paid to the 17 attorneys and law firms who are listed as "Class Counsel" in the Austrian Settlement. However, as previously noted, only 11 attorneys and law firms signed that agreement on behalf of the Austrian Settlement Class. Because the members of that Class did not hold the Assigned Claims until execution of the Austrian Settlement and the contemporaneous certification of the Class, the attorneys and law firms that did not sign the Austrian Settlement owed no duty of representation to these claim holders distinct from these lawyers' general duty to represent all of their Holocaust victim clients. Thus, Zeisl has no basis for claiming forfeiture of the fees paid to the six attorneys and law firms who did not sign the Austrian Settlement.[14] The erroneous listing of an attorney as counsel cannot establish an attorney-client relationship. Cf. Sao Paulo v. American Tobacco Co., 535 U.S. 229, 122 S.Ct. 1290, 152 L.Ed.2d 346 (2002) (impartiality of judge could not be reasonably questioned based on his erroneous listing as attorney on motion to file amicus curiae brief).
 
 
 38
 Further complicating consideration of the merits of Zeisl's claim is the imprecision of his complaint. On the one hand, he contends that Austrian Class Counsel breached their duties to the Austrian Settlement Class when they "agreed to the German Compact in which they impaired the Austrian Bank[s] Settlement Class members' rights in favor of the rights of their other clients."[15] Brief for Appellant at 38. However, he also argues that the breach occurred earlier, when the lawyers found themselves representing different clients with potentially conflicting interests against the same defendant. Id. at 49-52, 60-61. Thus, his grievance alternates between attacking the Austrian Settlement Class Counsel for agreeing to arrangements that allegedly prejudiced the holders of the Assigned Claims and attacking them for initially undertaking representation of the Class.
 
 
 39
 Whatever the basis of Zeisl's grievance, nothing occurred that could possibly justify forfeiture of the fees that have been awarded. Fee forfeiture is an equitable remedy that requires careful consideration of all the relevant circumstances. See Burrow v. Arce, 997 S.W.2d 229, 240 (Tex. 1999); Gilchrist v. Perl, 387 N.W.2d 412, 417 (Minn.1986); 1 Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering, § 8.21 n. 2 (Supp.2002). To the extent that the grievance is based on counsel's agreement to the German Compact, Zeisl ignores the realities of the context in which counsel were working. The negotiations that led to the creation of the German Foundation were very different from those that often occur between counsel for plaintiffs and defendants endeavoring to settle a typical class action. Even in the latter context, we have recognized that the traditional rules concerning conflict-free representation, applicable in non-class lawsuits, "should not be mechanically applied to the problems that arise in the settlement of class action litigation." In re "Agent Orange" Product Liability Litigation, 800 F.2d 14, 19 (2d Cir.1986).
 
 
 40
 The context of the negotiations leading to the German Compact far transcended even complicated class action litigation. This was an effort, ultimately extraordinarily successful, to persuade both defendants and non-defendants to create a massive fund for the benefit of Holocaust victims scattered throughout the world, some of whom were in some sense represented by counsel and many of whom were not. Major participants in the negotiations were the United States and Germany, acting through senior governmental officials. In a complicated and multilateral negotiation such as this, some claimants inevitably fare better than others. Once the terms of the proposed Compact emerged, the DM 10 billion (about $5 billion) was committed, and the strong backing of the United States and Germany was made clear, it would have been completely unrealistic to expect any attorneys to jeopardize the success of the Compact because a particular claim of their clients was not fully vindicated.[16] Indeed, despite the view expressed at the time of the Austrian Settlement that the Assigned Claims were possibly worth as much as $300 million, many knowledgeable observers during the negotiation of the German Compact considered the claims worthless, especially in view of the substantial argument that they appeared to be barred by the Austrian State Treaty of 1955. See Multilateral Austrian State Treaty, T.I.A.S. 3298, 6 U.S.T. 2369 (signed May 15, 1955).
 
 
 41
 Zeisl never quite says that the Austrian Settlement Class Counsel should have worked to defeat the German Compact because it made no provision for the Assigned Claims, but in faulting the attorneys for agreeing to the Compact, he effectively takes that extreme position. The reality is that the members of the Austrian Settlement Class along with Holocaust victims worldwide who were victims of Nazi era outrages will all be eligible to seek some redress (on their individual claims though not as assignees of the Austrian banks' claims) from a fund created in significant part through the tireless efforts of many of the attorneys who now stand accused of unprofessional conduct. It is not difficult to imagine the attack that would have been made had their insistence on some compensation for the Assigned Claims undermined the entire Compact.
 
 
 42
 To the extent that Zeisl's grievance concerns Class Counsel's undertaking a representation with a potential conflict among counsel's other clients, the matter merits further consideration. When the Austrian Settlement was reached, the eleven firms and attorneys who agreed to act as Class Counsel were placed in a position of potential conflict. One group of clients became holders of the Assigned Claims against the German banks, and another group of clients, including some within the first group, continued to hold individual claims against these banks. A potential conflict existed as both sets of claims were pursued in the Consolidated Class Action and in the extra-judicial negotiation that led to the German Compact: there was the risk, ultimately realized, that those offering to provide funds would favor individual claims and disfavor the Assigned Claims.
 
 
 43
 Where potential conflicts are reasonably apprehended, the appropriate response from counsel will vary with the circumstances. Sometimes the conflict is so likely to occur and so serious if it does occur that counsel may not undertake the representation that creates the conflict. See N.Y.Code of Professional Responsibility DR 5-105(a), N.Y. Comp.Code R. & Regs. tit. 22, § 1200.24(a); cf. Fiandaca v. Cunningham, 827 F.2d 825 (1st Cir.1987) (court required to disqualify class counsel who represented separate class with materially adverse interests). In other circumstances, an appropriate response is to call the matter to the attention of the court so that the court may determine whether a subclass needs to be certified and counsel need to be identified to represent solely the members of the subclass. See Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1176 (5th Cir.1978) ("when a potential conflict arises between the named plaintiffs and the rest of the class ..., the attorney's duty ... requires him to point out [the] conflict[] to the court...."); Silbiger v. Prudence Bonds Corp., 180 F.2d 917, 921 (2d Cir.1950) ("We agree that Silbiger failed in his duty when he did not present [the conflict] matter to the court and learn its pleasure....")[17]. In some circumstances a court itself might well have an obligation on its own motion, especially when called upon to approve a class action settlement, to designate a subclass and assure proper representation for the subclass, or to take other appropriate steps to lessen if not eliminate the potential for a conflict among class members. See Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1078 (2d Cir.1995) ("The ultimate responsibility to ensure that the interests of class members are not subordinated to the interests of either the class representatives or class counsel rests with the district court.").
 
 
 44
 In the pending matter, it does not appear that anyone raised the possibility that the Austrian Settlement Class Counsel might be conflicted until several months after the Austrian Settlement was concluded in March 1999. The first reference to a conflict we can locate in the record is the submission to the District Court by Zeisl's counsel, E. Randol Schoenberg, on January 6, 2000. He pointed out that in the negotiations that would lead to the German Compact "various classes of claimants, with widely different types of claims, will be competing with each other for shares of the German settlement." Schoenberg made no request for any specific relief concerning counsel, merely urging the District Court to "pay very close attention." Prior to the time the German Compact was concluded in July 2000, no request had been made to the District Court to take any action to avoid or minimize a potential conflict of Class Counsel.
 
 
 45
 On September 7, 2000, after the Compact was approved, Judge Kram took specific action endeavoring to protect the interests of holders of the Assigned Claims. Acting on her own motion, she appointed a co-counsel for the Austrian Settlement Class "with respect to the prosecution and administration of the Assigned Claims." When the counsel she selected resigned for reasons unrelated to this litigation, she then designated new co-counsel for the Class with the same duties concerning the Assigned Claims. Thereafter Judge Kram continued to express concern about a potential conflict. On January 29, 2001, before the Rule 23(e) hearing on the plaintiffs' motion to dismiss the Consolidated Complaint, Judge Kram ordered the parties to prepare materials considering, among other things, the "steps taken to ensure that there was no conflict of interest for counsel representing both plaintiffs with claims against German banks and members of the Austrian bank settlement class."
 
 
 46
 On March 7, 2001, Judge Kram's initial denial of the plaintiffs' motion to dismiss was partly based on her finding that "the instant application prejudices the sub-class because plaintiffs' counsel thereby consent to the applicability of the Statement of Interest to the Assigned Claims (a detriment only to the sub-class) in order to achieve a desired result for other plaintiffs, while the desired result (the Compact) excludes the sub-class." She reiterated this concern on March 20, 2001, in denying a motion for reconsideration of the March 7, 2001, ruling.
 
 
 47
 We appreciate the District Court's concern about the risk of conflicted counsel and its efforts to alleviate that risk. In hindsight, it would have been preferable for putative Class Counsel to have recognized the problem themselves and alerted the Court at the time the Austrian Settlement Class was certified. Had that occurred, the Court would have been in a position to designate counsel specifically to assert the interests of the holders of the Assigned Claims before those interests could be affected by the agreements of the German Compact.
 
 
 48
 At this point, however, our concern is not with what might better have been done in the past. The issue before us is whether the undertaking of representation of the Austrian Settlement Class by counsel with clients whose interests were potentially adverse to the holders of the Assigned Claims provides a basis for forfeiture of the fees fairly earned by those counsel for their role in the establishment of the German Foundation. Whatever deficiency might be thought to arise from that undertaking or from Class Counsel's failure to alert the Court to the potential conflict, the circumstances of this case would not warrant the equitable remedy of fee forfeiture. There is not the slightest indication that any of the Class Counsel who were engaged in this enormously complicated undertaking acted with anything less than the utmost good faith. They achieved extraordinarily beneficial results for their clients. To whatever extent their representation of the Austrian Settlement Class placed them in a position of potential conflict, they have thus far not even applied to the District Court for any compensation for that representation. In sum, no basis exists for obliging counsel for the Austrian Settlement Class to forfeit the fees awarded to them by the German Foundation for their efforts, in cooperation with many other lawyers, to achieve an extraordinary extrajudicial remedy for victims of the Holocaust.
 
 Conclusion
 
 49
 The order of the District Court denying the petition to forfeit fees is affirmed.[18]
 
 
 
 Notes:
 
 
 *
 Honorable Stefan R. Underhill of the United States District Court for the District of Connecticut, sitting by designation
 
 
 [1]
 The complaint also named as defendants certain German banks, but only as concerned conduct of subsidiaries now controlled by the Austrian banks
 
 
 [2]
 Although the putative class was never certified and the Consolidated Complaint was ultimately dismissed, we will refer to proceedings concerning this Complaint as occurring in "the Consolidated Class Action."
 
 
 [3]
 The Joint Statement is officially designated "Joint Statement on occasion of the final plenary meeting concluding international talks on the preparation of the Foundation `Remembrance, Responsibility and the Future.'"
 
 
 [4]
 The Governmental Agreement is officially designated "Agreement between the Government of the United States of America and the Government of the Federal Republic of Germany concerning the Foundation `Remembrance, Responsibility and the Future.'"
 
 
 [5]
 The German Law is officially designated "The Law on the Creation of a Foundation `Remembrance, Responsibility and the Future.'"
 
 
 [6]
 The motion also sought dismissal of other suits against German banks that had not been consolidated. Several other suits against German entities, consolidated in the District of New Jersey, were voluntarily dismissedNazi Era Cases, 198 F.R.D. at 447.
 
 
 [7]
 Also in May the District Court issued an order granting voluntary dismissal with prejudice of a separate action,Gutman v. Deutsche Bank, 01 Civ. 0473(SWK), brought by independent co-counsel asserting the Assigned Claims. The dismissal was with prejudice only as to the named plaintiffs and was explicitly without prejudice as to absent class members.
 
 
 [8]
 Joining Zeisl on the motion were two other members of the Austrian Settlement Class, one of whom was a named plaintiff in the action
 
 
 [9]
 Judge Parker, disagreeing on the jurisdictional issue, contends thatCooter & Gell does not support ancillary jurisdiction in the pending case because Rule 11 was the source of the District Court's authority to impose a sanction in Cooter & Gell and no similar source of federal authority is invoked to support the claim of fee forfeiture here. We think this argument fails to distinguish between jurisdiction and governing substantive law. Rule 11 provided only the governing substantive law for the sanction; the trial court's jurisdiction was supplied by ancillary jurisdiction. The Supreme Court left no doubt that ancillary jurisdiction was available to adjudicate the fee issue, not because Rule 11 was the source of the substantive law, but because the fee issue was so closely related to the underlying litigation. That link equally exists here. Indeed, even the strictest view of limited federal court jurisdiction would not consign to a state court the authority to determine whether lawyers must forfeit fees earned in connection with the settlement of a federal court lawsuit, in the context of an international agreement reached in cooperation with senior officials of the United States and foreign governments. We do not suggest, as Judge Parker apprehends, that ancillary jurisdiction is available for every claim against an attorney who has practiced in a federal court.
 
 
 [10]
 Whether the fees awarded by the arbitrators compensate in whole or at least in part for services rendered in connection with the Consolidated Class Action would be matters relevant to the amount of any fee, or in this case to the amount of any forfeiture, but would not affect ancillary jurisdiction
 
 
 [11]
 Judge Parker, disagreeing on the jurisdictional issue, suggests that we have failed to appreciate the rationale ofKokkonen, which, he points out, was to require an independent basis of jurisdiction for a claim seeking "more than just a continuation or renewal of the dismissed suit." Kokkonen, 511 U.S. at 378, 114 S.Ct. 1673. We agree that this is the rationale of Kokkonen, and it is the reason why Kokkonen does not preclude jurisdiction to adjudicate the pending fee forfeiture claim. To determine whether conduct occurring in the course of settling a federal court lawsuit warrants a forfeiture of the fee earned for achieving the settlement — a forfeiture alleged to be required because of conduct in the course of achieving the settlement — is in no sense "more than just a continuation or renewal" of the settled lawsuit. The court need only adjudicate a tail-end aspect of the suit that is inextricably connected to it.
 
 
 [12]
 Zeisl seeks forfeiture of the fees to the Austrian Settlement Class. If his petition had merit, it is possible that an alternative remedy would be a return of the fees to the administrative funds of the Foundation. It is doubtful that affording the Foundation the opportunity to accept the return of such funds would have been viewed by theDuveen panel as the sort of burden a district court should not impose. In any event, if such an opportunity were offered and declined, a court justified in ordering full or partial forfeiture would have ample opportunity to fashion a remedy that had no consequence whatever for the Foundation.
 
 
 [13]
 Zeisl refers to the "German Bank settlement" as if it were an agreement between the plaintiffs and the German bank defendants in the Consolidated Class Action in the Southern District. In fact, no such agreement exists. To the extent that there is an "agreement" as to the victims' claims against the German banks, it is the German Compact and its components, a set of agreements for which District Court approval under Rule 23 was never sought nor given. Curiously, when Zeisl first referred to "the German Settlement" in his District Court papers, he cited only to theNazi Era Cases, the consolidated action resolved by the New Jersey District Court. Zeisl Memorandum at 4. The New Jersey litigation, however, concerned primarily slave labor claims, not the claims about the confiscation of property by the German banks.
 
 
 [14]
 The six non-signers are individual attorneys Burt Neuborne and Arthur Miller and the law firms of Milberg Weiss Bershad Hynes & Lerach LLP; Cohen & Malad, P.C.; Fleishman, Fisher & Moest; and Much Shelist Freed Denenberg Ament & Rubenstein, P.C. Neuborne is identified in the official caption of the pending appeal as a "Plaintiff-Appellant," but in our Court he appears in support of the District Court's order dismissing the forfeiture petition and in support of his own conditional appeal. We have therefore identified him in the caption of this decision as "Appellee-Cross-Appellant."
 
 
 [15]
 To the extent that Zeisl faults the Austrian Settlement Class Counsel for agreeing to the German Compact, he is overclaiming as to two of the eleven counsel; William R. Marks and Frederick P. Furth did not sign the Joint Statement, the one component of the Compact that bears the signatures of any Class Counsel
 
 
 [16]
 We do not mean to imply that, in a different context, counsel might not fairly be faulted for impairing a claim of their clients simply because the impairment occurred in a negotiation that encompassed more parties than those formally associated with a lawsuit
 
 
 [17]
 We do not believe that the strict approach taken inSilbiger, which was not a class action, requiring forfeiture of at least one-third of the attorney's fee, 180 F.2d at 921, is applicable in the context of the pending litigation.
 
 
 [18]
 In view of our disposition of the appeal, Neuborne's conditional cross-appeal is dismissed as moot
 
 
 F.I. PARKER, Circuit Judge, concurring:
 
 50
 I agree with the result reached by the majority, but write separately to express serious reservations about the exercise of ancillary jurisdiction in this case.
 
 
 51
 I believe that this court lacks jurisdiction to consider appellants' claim. The claims against the German banks were dismissed by the district court pursuant to Federal Rules of Civil Procedure 41(a) and 23(e). The Supreme Court has held that there is no ancillary jurisdiction to enforce a settlement agreement when a court has dismissed an action under Federal Rule of Civil Procedure 41(a)(2) without reserving jurisdiction over the enforcement of a settlement or the conduct of the agreed actions. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). The majority's attempt to distinguish Kokkonen by saying that appellant is not seeking to enforce saying that appellant is not seeking to enforce the settlement agreement, fails to adequately appreciate the rationale underlying that decision. In Kokkonen, the Supreme Court explained that jurisdiction was lacking because "[e]nforcement of the settlement agreement ... is more than just a continuation or renewal of the dismissed suit, and hence requires its own basis for jurisdiction." Id. at 378, 114 S.Ct. 1673. The claim pursued by appellants is even less of a "continuation" of the dismissed suit than was the claim in Kokkonen, as appellants' claim does not even seek to resolve the same controversy that the original complaint sought to resolve. Thus, there is even less justification for finding ancillary jurisdiction here than there was in Kokkonen.
 
 
 52
 The Supreme Court's decision in Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990), does not support a finding of ancillary jurisdiction in this case either. In Cooter, the Supreme Court upheld a district court's decision to retain jurisdiction to impose sanctions under Federal Rule of Civil Procedure 11 ("Rule 11") after a plaintiff voluntarily dismissed the underlying case. Rule 11, however, specifically authorizes the federal courts to independently sanction attorneys.[1] Fed.R.Civ.P. 11(c). By contrast, there is not such explicit authority for federal courts to impose the sanctions sought in this case.
 
 
 53
 Similarly, I cannot agree with the majority's suggestion that ancillary jurisdiction exists because of the "`inherent power' of federal courts to discipline attorneys practicing before them." Majority Op., supra, at 99. Courts often speak of the "inherent power" to discipline attorneys. See In re Snyder, 472 U.S. 634, 643, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985)("Courts have long recognized an inherent authority to suspend or disbar lawyers"); United States v. Seltzer, 227 F.3d 36, 36 (2d Cir.2000)(speaking of a district court's power to discipline attorneys as part of its "inherent power to manage its own affairs"). The Supreme Court has explained that this power "derives from the lawyer's role as an officer of the court which granted admission." In re Snyder, 472 U.S. at 643, 105 S.Ct. 2874. Consistent with this derivation, the cases in which courts have found inherent power to discipline attorneys appear to be limited to those in which the attorney being disciplined violated a court order, disrupted a court proceeding, or otherwise abused the judicial process, and those involving suspension or censure. See, e.g., Seltzer, 227 F.3d at 42 (holding that the "inherent power of the district court includes the power ... to santion attorneys for ... violations of court orders or other conduct which interferes with the court's power to manage its calendar and the courtroom ..."). Such cases should not be read to mean that federal courts are free to exercise jurisdiction over all claims against attorneys that have practiced in front of them in the name of discipline, even if those claims relate to their practice of law. To allow such an expansive reach of federal jurisdiction would be contrary to the well-established maxim that federal courts are courts of limited jurisdiction. See, e.g., Kokkonen, 511 U.S. at 377, 114 S.Ct. 1673.[2]
 
 
 54
 Even if ancillary jurisdiction were possible through Zeisl's tangential relationship to the German Foundation Agreement, the district court would have abused its discretion if it chose to exercise it. See Chesley v. Union Carbide Corp., 927 F.2d 60, 64, 65-66 (2d Cir.1991)(holding that although a dismissal of the underlying litigation on forum non conveniens grounds did not automatically preclude the exercise of ancillary jurisdiction over a subsequent claim for attorneys' fees, exercise of such jurisdiction would nonetheless be an abuse of discretion where international comity required the district court to refrain from consideration of the claims).
 
 
 55
 For these reasons, I would affirm the district court's ruling that it lacked jurisdiction. I do note, however, that I have no quarrel with the majority's analysis of the merits of the claim.
 
 
 
 Notes:
 
 
 [1]
 It is also worth noting that the Rule 11 motion inCooter was filed prior to the dismissal of the underlying case.
 
 
 [2]
 I also note that the Supreme Court has cautioned against the free use of courts' inherent powers, and emphasized that use of such powers is discretionarySee Chambers v. NASCO, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)("Because of their very potency, inherent powers must be exercised with restraint and discretion.")